# ELMER A. SWEARINGEN v. CONSOLIDATED TROUP MINING COMPANY, Appellant.

### Division One, May 30, 1908.

1. **NEGLIGENCE: Mine: Pleading: Evidence of Defective Keying.** Where the petition charged that plaintiff's injuries "were the result of the negligence of defendant's foreman in failing to properly brace said posts and properly wedge and key such timbers and structure to the roof of the drift," the admission of evidence tending to prove that the foreman stopped the work of building the mine timbering before it was properly wedged against the roof and braced, was not irrelevant or error, although plaintiff was injured by the falling of the timbering while he was on it endeavoring to throw off the cord wood and timbers in order that the posts and caps might be replaced which had been displaced by an explosion of dynamite after the work of constructing the timbering had been stopped. The evidence was competent, under the petition, not only to show defective construction and that defendant was liable therefor, but also as bearing on the question of defendant's alleged negligence in sending plaintiff up on the timbers without making a more careful inspection than was made.

2. ———: ———: ———: **Cured by Instruction.** But even if the evidence was not relevant to prove negligence, the court cured the error by instructing the jury that defendant was not liable for defects in the original construction of the timbering, and that the only question for them was whether defendant exercised ordinary care in taking down the timbers after they had been twisted by the explosion.

Swearingen v. Mining Co.

3. ———: ———: Falling Timbering: Demurrer. In a mine drift, there had been erected, as timbering to support the roof, a structure of heavy timbers, resting for its foundation on four posts ten or twelve feet high and twelve inches in diameter. On top of the posts were placed caps ten or twelve inches thick, reaching from post to post across the drift. Then came the crib, built of timbers six or eight inches thick, reaching nearly to the roof, and on them was placed cord wood. After this structure had been erected, but had not been keyed up and braced, plaintiff, a miner, and his helper, were told by the foreman to drill and shoot with dynamite, and they did so, and the explosion drove one of the posts out of place at the upper end and twisted the cap. The plaintiff when he returned after the explosion thought the post was out of place ten or twelve inches, but the superintendents said it was from eighteen to thirty inches. There was no light except that in the miners' hats, and by them one standing on the ground could see the displacement at the top, and the foreman made no examination except from that standpoint, but having placed a timber two by ten inches under the cap, ordered plaintiff to climb up the structure and throw off the cord wood and timbers from the top, and assured him it was safe, and plaintiff in endeavoring to obey that order was injured by the falling of the structure. The superintendent of the mine and the general superintendent visited the mine, made a more careful examination and said there was a stope six or seven feet high on which plaintiff could have stood and with a stick pushed the timbers off from the top, and this testimony indicates that there was a safer way than by climbing the tottering structure, yet they gave the foreman no instructions, said that in his place they would have acted just as he did, and he took no notice of the situation, did not examine it from the stope or by means of any light other than that in the miners' hats. *Held*, that the court properly refused defendant's demurrer to the evidence:

4. ———: ———: ———: Instruction: Obeying Foreman: Dangerous Situation. The court instructed the jury that though plaintiff may have believed the act he was ordered to do by defendant's foreman was not safe, "yet this does not and should not defeat a recovery by him if you further find from the evidence that the plaintiff was negligently ordered into this position by said foreman and was told by him that it was safe and that plaintiff relied upon said assurance of safety and upon said order, provided that you further find that the danger of the timbering or structure falling was not of such a manifest or glaring nature as to threaten immediate injury in case the plaintiff obeyed the order." *Held*, to correctly state the law. The servant has the right to rely upon the superior knowledge

of his master, if it be a matter in which the master may be presumed to have superior knowledge, and also to trust that his master has exercised in his behalf the reasonable care the law requires of the master; and in this case it was the duty of the foreman, who had ample time after an explosion had displaced a post and a cap of the timbering of the mine, to make an examination, and it was his duty, not the plaintiff miner's, to make the investigation. And the evidence of defendant's superintendents is that the danger was not so obvious and glaring that plaintiff was guilty of contributory negligence in attempting to execute the foreman's orders, who specifically assured him it was safe.

5. ———: **Damages: Ability to Earn Livelihood.** An instruction, which tells the jury that in estimating plaintiff's damages they may "take into consideration the . . . loss of his leg, his inability by reason of such loss to earn a livelihood," does not mean that the loss of his leg rendered plaintiff totally incapable of earning a livelihood, and does not so inaptly express a true measure of damages as to constitute reversible error.

6. ———: ———: **Excessive Verdict: $10,000.** A verdict of $10,000 for a miner, twenty-four years old, who lost his leg, endured much physical and mental suffering and up to the time of the trial had not been able to do any work, is large, but not so excessive as will authorize the court to set it aside.

Appeal from Jasper Circuit Court.—*Hon. Howard Gray,* Judge.

AFFIRMED.

*A. E. Spencer* for appellant.

(1) The court erred in giving instruction 3 on behalf of plaintiff. The question for the jury was whether the condition was such that a reasonably prudent man would have refused to obey the order. If so, plaintiff was guilty of contributory negligence although the danger of the timbers falling was not so manifest or glaring as to threaten immediate injury. Bradley v. Railroad, 138 Mo. 309; Halliburton v. Railroad, 58 Mo. App. 34; Aldridge v. Furnace Co., 78 Mo. 565; Chicago, etc., Co. v. Sokowiak, 148 Ill. 573; Crookston Lumber Co. v. Boutin, 149 Fed. 680; Musser, Etc.,

Co. v. Brown, 126 Fed. 141; Cudahy Packing Co. v. Skoumal, 125 Fed. 470. (2) The court erred in refusing to instruct the jury that plaintiff could not recover, and in submitting the case to the jury. The evidence is that one of the posts was misplaced through the act of plaintiff. That it was then braced and supported by plaintiff and his fellow workman, was carefully examined by the representatives of defendant, and thought by them to be safe to work upon; that the proper way to handle the situation was to go upon the pen and throw down the timbers; that plaintiff was directed to and did go on the pen and throw down some of the timbers, and that for some reason not shown the pen fell and injured plaintiff. This does not convict defendant of negligence. Nolan v. Shickle, 3 Mo. App. 300; Hamilton v. Railroad, 100 S. W. 671; Beebe v. Railroad, 108 Mo. App. 138; Haynie v. Hammond Packing Co., 103 S. W. 580; Howard v. Railroad, 173 Mo. 524; Rickaly v. Boiler Works Co., 108 Mo. App. 138; Bowen v. Railroad, 75 Mo. 274; Patton v. Railroad, 179 U. S. 658; Railroad v. Sanders, 166 U. S. 620; Montana Copper Co. v. Van Buren, 123 Fed. 61; Shandrew v. Railroad, 142 Fed. 320; Omaha Packing Co. v. Sandusky, 155 Fed. 897.

*William B. Skinner* with *Thomas & Hackney* for respondent.

(1) The third instruction given by the trial court, of which complaint is made by appellant, in principle and in the very wording thereof, is correct, and the same has been many times approved by the appellate courts of this State. Carter v. Baldwin, 107 Mo. App. 217; Harriman v. Railroad, 27 Mo. App. 435; Huhn v. Railroad, 92 Mo. 440; Stephens v. Railroad, 96 Mo. 207; Warner v. Railroad, 62 Mo. App. 184; McGowan v. Railroad, 61 Mo. 528; Hamilton v. Rich Hill Mining Co., 108 Mo. 364; Hammon v. Central Coal &

Coke Co., 156 Mo. 232; Holmes v. Brandenbaugh, 172 Mo. 53; Clippard v. Railroad, 202 Mo. 432; Shepherd v. Railroad, 189 Mo. 362. (2) The trial court properly refused defendant's instruction in the nature of a demurrer to the evidence, and the cause was properly submitted to the jury, and the evidence amply supports the verdict and judgment herein. Gallagher v. Edison Illuminating Co., 78 Mo. App. 576; Sackewitz v. Am. Biscuit Co., 78 Mo. App. 144; Blanton v. Dold, 109 Mo. 64; Turner v. Haar, 114 Mo. 335; Hamilton v. Railroad, 100 S. W. 671; Holweg v. Bell Telephone Co., 189 Mo. 165; Folk v. Schaffer, 186 Pa. St. 253; Beebe v. Railroad, 103 S. W. 1019. (3) Instruction 4, given for plaintiff, on the measure of damages, of which defendant complains, is correct. A similar one was given in Carter v. Baldwin, supra, and it was not even criticised, and the form thereof has been many times approved by this court. Plaintiff testified that he had been unable to work since his injury.

VALLIANT, P. J.—Plaintiff recovered a judgment for $10,000 as damages for personal injuries which he alleges he sustained through the negligence of the defendant. From that judgment the defendant has prosecuted this appeal.

Defendant is a mining corporation and plaintiff was one of its employees. The mine in which the accident occurred consisted of a shaft about one hundred and thirty feet deep and a main drift extending therefrom eighty or one hundred feet, and from this main drift a side drift was being cut which at the time of the accident had been cut to a distance of thirty to forty feet. It was in this side drift that the accident occurred. The condition of the earth through which the drift was being cut was such that it required what is called "timbering" to support the roof. The drift was about fourteen feet wide and estimated to vary from

sixteen to thirty feet high. The work of timbering and that of cutting the drift was done under the supervision and direction of a foreman named Harry Needles called "the ground boss." The plaintiff was one of the gang of laborers doing the work. He was twenty-four years old. He had been doing mining work five or six years, and had been doing this kind of underground work about a month. The structure called timbering is thus described in appellant's brief: "This was done by placing two upright posts of proper diameter opposite each other near the two walls of the drift. Resting on top of these posts was a heavy timber, called a cap, running across the drift. A few feet ahead of this were put in two other posts and a cap. Then timbers, called stringers, were laid over the two caps, and on this was built up of timbers a pen, decreasing in size to correspond with the arch of the roof of the drift. When this pen got near the roof the remaining space from top of pen to the roof was packed tightly with cordwood. The four posts, with caps and superstructure, were called a set of timbers."

The testimony for the plaintiff tended to show that Needles, under whose personal supervision the work of timbering was being done, stopped the work before the last set of timbers had been "keyed up or braced." Defendant objected to that evidence on the ground that it was attempting to prove an act of negligence different from that charged in the petition; the court overruled the objection and allowed the evidence, not as tending to prove negligence, but as going to show the condition of the set of timbers, and later at the request of the defendant the court gave an instruction to the jury that they should not consider it as any ground for holding the defendant liable. As soon as the last set of timbers was finished, which was about 2 or 3 o'clock in the afternoon, the ground fore-

man, Needles, directed the plaintiff and his work-mate
to drill a hole in the face of the drift and shoot by ex-
ploding dynamite in it. This the plaintiff and his mate
immediately set about doing and finished it about 3:30
or 4 p. m. and loaded it to shoot, then they retired to
a safe place until the shot was fired.

When Needles gave the order to plaintiff to drill
the hole and shoot he went off to some other part of the
mine, and was not present during the performance of
that work. After the shot was discharged plaintiff
and his coworker returned to the scene and they there
discovered that by force of the explosion one of the
four upright posts on which the set of timbers was
built had been knocked out of line, estimated by plain-
tiff to be ten or twelve inches at the top, by other testi-
mony estimated at eighteen inches or two feet, the cap
had been partly displaced, and four or five sticks of the
cordwood had fallen to the ground, but from where he
stood, with the poor light and the smoke he could not
see the condition of the pen or how far it was out of
line. Plaintiff and his companion then undertook to
brace the leaning timber and did so as best they could
with the means at hand, and after moving the fallen
cordwood out of the path of the shovelers they went
out of the mine to get their suppers, their regular day's
work being then ended. After the plaintiff left the
mine, Needles returned to the scene of the explosion
and examined the situation and then he went out of the
mine and going to plaintiff just before supper told
him that he would have to work extra and go under
ground after supper and fix the timbers that had been
displaced by the explosion. Accordingly after supper
plaintiff returned with Needles and others to the scene.
There were five or six men in all there; each had the
usual miner's lamp in his hat, which was the only light
in the place. The testimony was to the effect that the
condition of the crib, the extent to which it had been

affected by the explosion, could not be well seen from where the men stood with the miner's lamps. The illuminating power of a miner's lamp was stated to be about that of an ordinary tallow candle. The foreman, Needles, with the help of one of the men, put a brace under the cap of the leaning post, using for that purpose a two-by-ten piece of timber. Then Needles ordered the plaintiff to climb up the structure and throw the timbers off. The plaintiff's testimony was that Needles said to him: " 'Rustle on up there and throw off those timbers; let's hurry up and get them timbers straightened up,' and I asked him if it was safe. Q. What did you say to him? A. I said, 'Harry, is that safe?' and he said, 'Yes, it can't fall,' and I commenced climbing on up and I began—my partner asked the same—and we went up and went to throwing off this pen, or we went up, and I think I threw off a stick or two; I had been up there a very few minutes before it fell down.'' In his fall the plaintiff was buried in a mass of fallen timbers and received very serious injuries. The other man who was working with the plaintiff and who was also ordered by Needles to go up and assist in throwing off the timbers started to climb up but before he reached the top the structure fell. Other witnesses who were present at the accident testified substantially as did the plaintiff. A witness testified that it was so dark in the place that when the plaintiff was climbing up the witness could not see his form but could see only the lamp in his hat as he fell.

Needles was not present at the trial. The defendant introduced evidence tending to show that it had made an effort to obtain the presence of Needles as a witness but was unable to do so. The plaintiff introduced evidence tending to show that Needles was within reach of subpoena and defendant could have produced him if it had desired.

The superintendent of the mine was a witness for

the defendant. He saw the structure after the explo-
sion, but was not present at the accident. He testified
that the drift at that point was fourteen to sixteen feet
high, that the upper end of the post that had been
dislocated by the explosion was two or two and a half
feet out of plumb. He gave no orders to Needles about
it, did not consider it a very serious situation; in his
opinion the proper way to do in the condition was to
send a man up, just as Needles had done in this case,
to throw off the timbers from the top; he did not re-
gard it a dangerous operation, said it was the usual
way of doing it. On cross-examination he said there
was a stope six or seven feet high on which a man
could have stood and with a stick have pushed the tim-
bers off.

There was a general superintendent of defend-
ant's mines, who was also a witness for defendant. He
was in this mine shortly after the explosion and exam-
ined the set of timbers to see the extent of the displace-
ment. In his opinion the post was out of plumb about
eighteen inches or two feet. He went upon the pile of
dirt which had been shot out with the blast; on this
pile of dirt was some cordwood that had fallen down;
from that point of view he examined the timber set
that had been creeled over; standing on the pile of dirt
his forehead was a little higher than the cap; he gave
the situation a careful examination, after which he
said to those who were with him, "This is bad luck
but it don't amount to anything; it is only a loss of a
couple of hours time to take it down and raise it again."
He then went away and dismissed it from his mind,
went home and thought no more about it until later in
the evening he was informed by telephone of the acci-
dent. He said that the twisting of a set of timbers in
that way was a very common incident in mines. He
gave no orders to the superintendent of that mine who
was with him when he made the inspection, nor to Nee-

dles, the ground foreman, because it was a simple matter that Needles needed no instructions about, the way Needles went about rectifying the matter was the usual and proper way.

I. Defendant assigns as error the admission of the evidence tending to prove that Needles stopped the work of building the set of timbers before it was properly wedged against the roof and braced. Defendant objected to this evidence when it was offered as irrelevant, that is, not tending to prove any fact in issue, that the only act of negligence in issue was the sending of the plaintiff up on the timbers in the condition in which they were after being dislocated by the explosion. The petition distinctly states that the ground foreman stopped the work before the set of timbers was so keyed and braced, and charges that it was an act of negligence and that plaintiff's injuries ''were the result of the negligence and carelessness of defendant's agents and ground foreman, Harry Needles, in failing to properly brace said posts and properly wedge and key such timbering and structure to the roof of the drift, in failing to properly inspect and ascertain the defective and dangerous condition of such timbering and structure, and in carelessly and negligently ordering plaintiff to climb to the top of the same and in assuring him that it was safe to do so, when, in fact, it was not safe,'' etc.

This evidence was competent, not only for the limited purpose for which the court admitted it, but also as bearing on the question of negligence in sending the plaintiff up on the timbers without making a more careful inspection of the condition than was made. Whilst, as it was shown by the evidence, the dislocation or disarrangement of a set of timbers by explosions in the mines was not an unusual occurrence, yet it is but reasonable to assume that a set of timbers braced and tightly keyed against the roof would have

greater strength of resistance and would be likely to suffer to a less degree in its structure from such an explosion than one not braced or keyed. The ground foreman is charged with the knowledge that this set of timbers was not so braced or keyed, and when he was informed of the dislocation of the timbers by the explosion he should have taken that fact into account and examined the condition with all the more care. The same force will knock a loose set of timbers into greater disarrangement than a set tightly keyed against the roof of the drift and braced. But the court at the request of the defendant instructed the jury that defendant was not liable for defect in the original construction and erection of the timbers, and that the only question for them was whether defendant exercised ordinary care in the taking down the timbers after the same had been so twisted. Therefore, if the evidence had been irrelevant, the error was cured by the instruction. Defendant has no cause to complain on that point.

II. The court refused to instruct the jury that the plaintiff was not entitled to recover. This is assigned as error.

In support of this proposition the appellant in its brief says: "The evidence is that one of the posts was misplaced through the act of the plaintiff." We do not so understand the evidence. There is no evidence tending to show that in drilling the hole, loading it with dynamite and exploding it the plaintiff did anything wrong or negligently. He did what he was ordered to do and what he was hired to do. The timbers were driven out of place by force of the explosion, a result which defendant's general superintendent testified was not an unusual occurrence.

Needles was the defendant's foreman in charge of that work. Both the superintendent of that mine, and the general superintendent of all of defendant's mines

in that group, testified that the work to be done was particularly in the scope of Needles' duty and they gave him no advice or direction because it was his business and he needed none. The plaintiff was the defendant's servant under Needles, Needles had hired him, could discharge him, gave him orders about his work, as to the plaintiff Needles was the master or stood in the master's place.

We have for our contemplation a structure of heavy timbers, resting for its foundation on four posts ten or twelve feet high and twelve inches in diameter, on the top of the posts first came the caps ten or twelve inches thick reaching from post to post across the drift, then the crib, built of timbers six or eight inches thick, reaching nearly to the roof, and then came the cordwood. The explosion drove one of these posts out of place at its upper end, the plaintiff thought when he returned after the explosion that it was out of place ten or twelve inches, but with the smoke and dim light he could only estimate; the defendant's superintendents, who saw it later, said it was eighteen inches or two or two and one-half feet.

That much of the structure was visible by aid of the miner's hat lamp to one standing on the ground; beyond that it was dark. To what extent the timbers constituting the superstructure were displaced could not be seen from that standpoint and with that light. Needles made no examination of the structure except from that standpoint and with that light, yet he ordered the plaintiff to climb up the structure and throw off the timbers from the top; in his endeavor to obey that order, the plaintiff suffered the injuries for which he brings this suit.

Could the trial court, viewing the situation as thus shown by the evidence, have said as to a matter about which there could be no two honest different opinions that the foreman in sending the plaintiff into that dan-

ger exercised the reasonable care that a master should observe for the safety of his servant?

The superintendent of this mine and the general superintendent of the group of mines, each visited the scene and each made a more careful examination than, as it seems, did Needles, yet neither thought it worth while to give Needles any instructions; they each testified that in his place they would have done just as he did. The mine superintendent said there was a stope six or seven feet high on which one could have stood and with a stick have pushed the timbers off from the top. The general superintendent said that he climbed to the top of the pile of earth thrown out by the explosion which was so high that standing on it his forehead was a little higher than the cap. The testimony of both those witnesses for the defendant indicates that there was a safer way to get those timbers down than sending a man to climb up the tottering structure. Yet Needles took no notice of that situation, did not even examine it from the stope or the pile of earth, but, without attempting to see beyond the limited distance dimly lighted with the lamps in the miners' hats, he ordered the plaintiff to climb up the structure. The testimony shows that as soon as he gave the order and assured the plaintiff there was no danger, he turned and walked away himself and was not standing there when the structure fell. In the absence of evidence as to where he went and for what purpose, we will not infer that he went away to be out of reach of what he suspected might be danger, but unless he could show why he went away it is reasonable to infer that he regarded the situation as of trifling interest and not worthy of his personal supervision. He miscalculated the danger, he did not examine the situation as he might have done—he did not make any but the most casual or superficial observation. Our estimate of the case is that there was not only some evidence tending

to prove that Needles was negligent, but the evidence to that effect was very strong and there was none to the contrary, saving only the opinion evidence of the two superintendents that the way Needles did was the usual way and the best way. The court did not err in refusing the instruction that would have taken the case from the jury.

III. By instruction three for the plaintiff the jury were instructed that though the plaintiff may have believed the act he was ordered to do was not safe, "yet this does not and should not defeat a recovery by him in this action if you further find and believe from the evidence that the plaintiff was negligently ordered into this position by said Needles and was told by said Needles that it was safe and that the plaintiff relied upon said assurance of safety and upon said order, provided you further find that the danger of the timbering or structure falling was not of such a manifest or glaring nature as to threaten immediate injury in case the plaintiff obeyed the order." This is assigned as error.

The law is correctly stated in that instruction as will be seen by reference to the numerous cases cited in respondent's brief, among which are Hammon v. Central Coal & Coke Co., 156 Mo. 232; Sheperd v. Railroad, 189 Mo. 362; Clippard v. Railroad, 202 Mo. 432.

The plaintiff knew that the structure had received a severe blow, that one of the posts on which it rested had been driven out of place, and this knowledge caused him to be apprehensive of danger. Therefore, when ordered to climb up on the structure, he asked the foreman if it was safe and on being assured by the foreman that it was safe he immediately proceeded to execute the order. He testified that he trusted in the assurance the foreman gave him.

In an emergency of that kind the servant has the right to rely not only on the superior knowledge of his

master, if it be a matter in which the master may be presumed to have superior knowledge, but also to trust that his master has exercised in his behalf that reasonable care that the law requires of a master. The plaintiff was a young man of twenty-four years, he had been working in mines of this kind several years, but had been at this kind of work, timbering and drifting under ground, only about a month. He was working under the eye of the man who had hired him and who could have discharged him, the man whom the mine owner had distinguished above the ordinary miner, presumably for his superior skill; therefore when ordered to go into the place of danger he asked the man who gave the orders if it was safe and when the man assured him that it was he trusted him. From the time the shot that displaced the post was fired to the time when the plaintiff returned to the work the foreman had ample time and opportunity to have made a careful examination and the plaintiff had the right to trust that he had done so. The defendant cannot say in this case that the danger was so obvious and glaring that plaintiff was guilty of contributory negligence in attempting to execute the order, because the evidence of the defendant's two superintendents is to the contrary; the danger was there and easily to be discovered, but it was hidden in the darkness of the arched roof of the drift. Nor can the defendant say that the danger could have been discovered as easily by the plaintiff as by the foreman, because in the first place there was no duty on the plaintiff to make the investigation, while there was a duty on the foreman to investigate, and also because the means of investigating were with the foreman, not the plaintiff. There was no error in giving that instruction.

IV. In instruction four for plaintiff on the measure of damages the jury were told that they might "take

into consideration the mental and physical pain and suffering endured by plaintiff since his injury in consequence thereof, the loss of his leg, his inability by reason of such loss to earn a livelihood for himself." Appellant complains of the item of "inability to earn a livelihood" in that instruction. The interpretation that counsel for appellant put on those words is that the court assumes that the loss of the leg rendered the plaintiff totally incapable of earning a livelihood. That is not the natural interpretation or the interpretation that a jury would be likely to put on the words. The fact that a man with one leg amputated five or six inches above the knee may earn a livelihood is a fact of such common knowledge that no one would say to the contrary or be misled as to the meaning of such words in that connection. But it is also a fact of equally common knowledge that the loss of a leg may impair the capacity of a man to earn a livelihood in certain lines of work; it is likely to close some avenues of employment to him, or else render him less efficient in such. That is all that this instruction means to say on that point, and it is a subject of such common sense knowledge that the jury could not have been misled by it. The instruction might have been more accurately worded, but it is not reversible error.

V. It is also contended that the damages awarded are excessive.

It is impossible to calculate the amount necessary to compensate one for such injuries with anything like mathematical accuracy, or as you would calculate the impairment of the value of property. There is a mental as well as a physical suffering, there is a closing of the way into which a young man's ambition may have led him to hope for a bright future, disappointment and humiliation may take the place of hope and

manly pride, and a blight falls upon his young life. Who can put down in dollars and cents the exact amount that will compensate him? The evidence was that the plaintiff's leg was crushed and mangled in the fall and it was amputated in the hospital a few days afterwards, he also had a cut on the head, he was confined in the hospital about two months and suffered a great deal, and up to the date of the trial, which was about a year after the accident, he had not been able to do any work. The jury awarded him $10,000 damages. That is a large award, but there is nothing in the record to indicate that it was not the calm, impartial judgment of the twelve men who composed the jury. We do not feel justified in setting aside the award. The judgment is affirmed.

All concur.