FRANK BOTEN, by his Next Friend, A. BOTEN, Respondent, v. THE SHEFFIELD ICE COMPANY, Appellant.

Kansas City Court of Appeals, April 18, 1914

1. **NEGLIGENCE: Assumption of Risk: Contributory Negligence.** Plaintiff was employed in helping to take down an ice house. While standing on the roof in the valley between the sloping roofs of two adjacent rooms, the plate on which he was standing broke, throwing him to the ground and injuring him. *Held*, that he could not be charged with contributory negligence as matter of law unless the building was admittedly so clearly and obviously dangerous that a reasonable man would not have attempted to go upon it to take it down.

2. ———: ———: **Assurance of Safety.** Plaintiff was eighteen years of age, reared on a farm and had had no prior experience in wrecking buildings. Defendant's president superintending the work of wrecking the ice house was a man of twenty years experience in that work. The plate on which plaintiff stood broke because of its decayed condition. This condition was known to defendant's president and was easily observible from the inside of the building. Its condition was unknown to plaintiff and he was never in a place where he could have discovered its decayed state. Although defndant's president knew of its condition, he not only took no steps to remedy the situation, but he assured plaintiff that the place was safe. Plaintiff, unaware of the defect, relied upon the assurance of safety and was injured. Under such circumstances the master is liable, and cannot escape on the ground that plaintiff assumed the risk.

3. ———: ———: ———: **Inherent Danger.** The danger to plaintiff arose not from any danger inherent in the nature of the work, that is, from the general liability of the building to fall, but from a defective condition at one place, known to defendant, and unknown to plaintiff; and defendant, without remedying the defect, assured plaintiff it was safe. With that knowledge, it was defendant's duty to furnish plaintiff with a place to work as safe as the nature of the work would permit. And by assuring plaintiff it was safe, the case was no longer in the domain of assumption of risk as matter of law.

4. ———: ———: ———: **Expression of Opinion: Lapse of Time Between Assurance and Complaint.** Evidence as to assurance

of safety examined and *held* to be more than mere expressions of opinion that the place was safe. Nor were they so general as not to apply to the place where defendant fell. Nor was the effect of the assurance destroyed by the interval of time that elapsed between the giving of the assurance and the breaking of the plate because the progress of the work had not changed conditions.

5. **PLEADNG: Petition: Sufficiency.** The petition is not open to the charge of insufficiency because it failed to allege that plaintiff could not have discovered the defective condition of the plate by ordinary care. The petition charged that plaintiff did not know of the dangerous condition, that defendant did know of it and assured plaintiff it was safe, and plaintiff relied thereon. Under these circumstances plaintiff was not bound to search for danger.

6. **VOIR DIRE: Examination of Prospective Juror.** It is not error in the examination of jurors on their *voir dire* to ask them a general question as to their connection with indemnity insurance companies provided it is asked in good faith, where an indemnity company is defending the case and the name of the particular company has not been disclosed.

7. **EVIDENCE: Asking as to Indemnity Insurance.** It is error to ask a witness if the defendant carries indemnity insurance unless the question is a pertinent one under the issues. In this case one of the issues was whether the defendant was doing the work. The fact that it took out indemnity insurance covering the men engaged in this particular piece of work would be some evidence that it was doing the work. The question, therefore, was not error.

8. **VERDICT: Excessiveness.** The evidence in this case examined and the verdict is held not to be excessive.

Appeal from Jackson Circuit Court.—*Hon. James E. Goodrich*, Judge.

AFFIRMED.

*Pierre R. Porter* for appellant.

(1) The demurrer to the evidence should have been sustained. Bloomfield v. Wooster Const. Co., 118 Mo. App. 254; Henson v. Packing Co., 113 Mo. App. 618; Meehan v. Railroad, 114 Mo. App. 396; Ziegen-

meyer v. Goetz, 113 Mo. App. 330; Kane v. Railroad, 112 Mo. App. 650; Henry v. O'Brien Boiler Co., 151 Mo. App. 591. (2) The court erred in overruling defendant's motions to discharge the jury. Hollenbeck v. McCord, 152 Mo. App. 254; Gore v. Brockman, 138 Mo. App. 231; Trent v. Lechtman Printing Co., 141 Mo. App. 437; Volkmann v. Brossman, 129 Ill. App. 182; George A. Fuller v. Darragh, 101 Ill. App. 664; Manigold v. Black River Traction Co., 80 N. Y. Supp. 861; Herrin v. Daly, 80 Miss. 340; Iverson v. McDonnell, 36 Wash. 73.

*Atwood & Hill* and *W. E. Pepperell* for respondent.

(1) The demurrer to the evidence was properly overruled. The evidence showed that the defendant sent plaintiff into an unsafe place to work, knowing that it was unsafe, and assuring plaintiff that it was perfectly safe. Plaintiff did not know of said unsafe condition, and relying upon the positive assurance of safety of defendant, plaintiff took his position of danger on top of the roof which afterwards fell. Under such evidence defendant is liable. Burkard v. Leschen & Sons Rope Co., 217 Mo. 466; Sullivan v. Railroad, 107 Mo. 66; Dodge v. Coal & Coke Co., 115 Mo. App. 501; Carter v. Baldwin, 107 Mo. App. 217; Swearingen v. Mining Co., 212 Mo. 524; Sampson v. Railroad, 156 Mo. App. 419; Hoover v. Coal & Min. Co., 160 Mo. App. 326; Depuy v. Railroad, 110 Mo. App. 110; Charlton v. Railroad, 200 Mo. 413. (2) The court properly refused to discharge the jury. Saller v. Friedman Bros. Shoe Co., 130 Mo. App. 712, 109 S. W. 794; Meyer v. Gundlach-Nelson Mfg. Co., 67 Mo. App. 389.

TRIMBLE, J.—Plaintiff was assisting in taking down an ice house belonging to defendant. During the progress of the work the place whereon he stood broke on account of its rotten condition, and plaintiff

fell to the ground receiving a broken hip and other injuries. The suit is for damages received by the fall. He recovered in the trial court and defendant has appealed.

The building was about 100 feet square and divided into five rooms, each 20 feet in width running the full length of the structure. Over each room was a gable roof sloping both ways from the roof ridge down to the valleys which extended lengthwise and above the partitions separating that room from the others. These valleys were about 32 feet from the ground. The roof of each room was supported by rafters placed parallel to and at regular intervals from each other and extending from the comb or roof-ridge down to the valley. Sheeting was nailed across the rafters and on the sheeting were the shingles. The feet of these rafters rested on the plate which was a timber of some width lying along and on the top of the wall of each room and was supported by posts in the walls set in the ground at intervals. The valley, therefore, lay along and upon the top of this plate. Over this plate was placed tarpaper and gravel forming the trough of the valley and preventing water from running through into the building. The condition of the plate, therefore, could not be observed by one standing on top in the valley because of this tarpaper and other roofing material, but the plate and its condition were easily observable from the inside of the room. This is important because plaintiff's fall was caused by the breaking of the plate, which was decayed, and plaintiff's complaint is that defendant knew of its rotten condition (which was unknown to plaintiff), and negligently assured plaintiff that the place where he was working was safe, and plaintiff relied upon that assurance and was injured by reason of the carelessness and negligence of defendant in directing plaintiff to work in a dangerous and unsafe place with an assurance that it was safe, when plaintiff did not know and

had no reasonable means of knowing that it was unsafe. The answer was a general denial, a plea of contributory negligence, a further plea that the injury was caused by the negligence of plaintiff's fellow servants, and lastly a plea of assumption of risk.

Plaintiff had been employed about four days but during that time had not been in the building and had not been in it for more than a year. On the day of the accident plaintiff was helping to tear the sheeting from the rafters over the east half of room No. 4 which was next to the outside room of the building on the east. He was standing in the valley between the roofs of rooms Nos. 4 and 5 and on the plate above mentioned. The sheeting was removed by beginning next to the roof ridge and working down to the valley or to what would have been the eaves of the room had it been standing alone. The sheeting had been removed down far enough to enable plaintiff to stand in the valley between rooms four and five. While thus standing and engaged in taking the sheeting from the rafters as aforesaid the plate broke and threw him to the ground.

Defendant insists that its demurrer should have been sustained. So far as contributory negligence and the plea that the accident was caused by plaintiff's fellow servants are concerned, they are clearly not in the case, at least not at this stage. The house, though old, was not so weak or dilapidated as to be obviously about to fall. The outside walls looked safe and the evidence was the building was being taken down piece by piece for further use as lumber. Unless the building was so obviously dangerous that a reasonable man would not have attempted to go upon it to take it down, plaintiff cannot be charged with contributory negligence. Plaintiff's fall was brought about, not by a collapse of the building, but by the breaking of the plate on account of a local defect hidden from him. He was not even aware of the danger to which he was subject by reason of the defect. And as to the fellow

servant doctrine, it cannot of course apply since no act of a fellow servant caused the injury.

As to the plea of assumption of risk, certain important elements in the case operate to take it out of the rule that a servant assumes the ordinary risks inherent in the nature of the business in which he is engaged, and these elements must be carefully borne in mind. (1) Plaintiff was only 18 years of age, reared on a farm, with no prior experience in wrecking buildings. Defendant's president, in charge of the work, was a man of twenty years experience in that kind of work. He was an expert. (2) Plaintiff was never in a position where he could observe the plate or its condition. He had never seen it and did not know it had rotted. But defendant's president knew it and had known it for a long time. (3) Knowing of its defective condition, he not only failed to take any steps to remedy it, but he assured plaintiff in the most positive manner that the place was safe. (4) Plaintiff, unaware of the defect, relied upon the assurance of safety and was injured. Under such circumstances the courts have repeatedly held the master is liable. [Burkhard v. Rope Co., 217 Mo. 466; Swearingen v. Mining Co., 212 Mo. 524; Carter v. Baldwin, 107 Mo. App. 217; Dodge v. Mfrs. Coal & Coke Co., 115 Mo. App. 501.] The fact that plaintiff was engaged in tearing down a building and therefore was engaged in a more or less hazardous undertaking, can make no difference in this case. The danger to plaintiff arose not from the general liability of the building to fall, but from a defective condition at one place known to defendant and unknown to plaintiff; and defendant, without remedying said defect, assured plaintiff it was safe. With that knowledge, it was defendant's duty to furnish plaintiff with a place as reasonably safe as the nature of the work would permit. [Dayharsh v. Railroad, 103 Mo. 570; Carter v. Baldwin, 107 Mo. App. 217.] And by assuring plaintiff it was safe, the case was no longer

in the domain of assumption of risk as a matter of law. [Adolph v. Columbia Baking Co., 100 Mo. App. 199, l. c. 208.]    The case was, therefore, properly one for the jury.  [Hoover v. Western Coal & Mining Co., 160 Mo. App. 326.]

We cannot agree with defendant that the statements made and repeatedly given to plaintiff were mere expressions of opinion and did not amount to an assurance of safety.  When plaintiff first went to work on the building defendant's president, on the ground and in charge of the work, told the employees, including plaintiff, that the building was perfectly safe. Some of the boys were apprehensive about going upon the building and the president said in plaintiff's presence and hearing: "Boys, there ain't a bit of danger in the world; go right on up; I will go up and work with you.  Q.  Tell the exact language he used and all he said.  A.  He said, "The building ain't a bit dangerous; you needn't be  scared about going high." During the progress of the work the president again said: "There ain't no danger in the world; it is perfectly safe; if there was any danger in the world, boys, I would not have you up there.  By the court: Q.  You heard that, did you?  A.  Yes, sir."  On cross-examination plaintiff was asked as to what the president said to him and this occurred:

"Q.  Did he say anything to you about the plate? A.  No, sir.

"Q.  Over which you were working?  A.  No, sir.

"Q.  He never told you that was safe?  A.  He said the building was perfectly safe.

"Q.  But he did not tell you anything about the plate?  A.  No, sir.

"Q.  He did not tell you anything about that part of the roof where you were working when you fell?  A. Yes, sir.

"Q. What did he say? A. He said—he told a boy to go out and saw off a board and he said he was scared and he said it was perfectly safe out there, not a bit of danger in the world; he said, if there was any danger in this building I would not have you boys up there. I heard him say that." Again at another place plaintiff testified:

"Q. You say Mr. Garlock told you that it was safe there? A. Yes, sir.

"Q. What were you doing at the time he told you that? A. We were tearing off sheeting and letting down rafters.

"Q. Which were you doing? A. First one and then another.

"Q. Were you doing them both at once? A. No, sir.

"Q. Which were you doing when he told you it was safe up there? A. Letting down rafters and tearing off sheeting.

"Q. You were not tearing off sheeting at that time, were you? A. Yes, sir; we were doing both.

"Q. At the same time? A. No, sir.

"Q. Well, what were you doing? A. Tearing off sheeting.

"Q. Then you were not letting down rafters? A. No, sir.

"Q. Whereabouts were you tearing off sheeting? A. I was tearing off sheeting off of the rafters.

"Q. Whereabouts? A. On the ice house.

"Q. On the place where you fell? A. Not exactly right there, but pretty close to it."

When the president gave him these assurances they were working on the roof over room No. 5, but the valley in which plaintiff was standing when he fell was the same valley he was in when the president told him this, since it was formed by the west half of the roof over 5 and the east half of room 4. In other words, when the president told him it was safe plain-

tiff was in the valley between 4 and 5 taking boards off of room 5, and when plaintiff fell he was standing in the same valley but taking boards off of room 4. This is shown by the following testimony:

"Q. Now, the place where he sent you that he said was safe was not the place where you fell, was it? A. He said the whole building was safe.

"Q. Never mind about that now. You can answer my question, can't you? The place where he sent you that he said was safe was not the place where you fell, was it? A. Yes, sir; we worked right along there where we fell.

"Q. Do you mean to say that for several days you tore off sheeting in the identical place where you fell? A. No, sir.

"Q. Then the place where you fell was not the place where you were on the first day when he told you it was safe? A. No, sir.

"Q. Then the place where you fell was not the place where you were on the first day when he told you it was safe? A. We were working right along there.

"Q. What do you mean by right along there? A. Right along where we fell.

"Q. Do you mean for several days you were taking off sheeting from the place where you fell? A. I never said that.

"Q. Where were you working when you fell? A. On the valley.

"Q. On which house? A. Between No. 4 and No. 5.

"Q. When you first began to work on the building, where were you working? A. In the valley taking sheeting off of No. 5.

"Q. When you fell, you fell from the roof of No. 4, didn't you? A. No, sir; I fell from the valley between 4 and 5."

It is thus seen that the statements of the president were not the expression of a mere opinion, nor were

they so general as not to apply to the place where plaintiff was working when he fell. Nor does the fact that the assurances of safety were given on one day and the fall occurred on another, while the president was absent, change the situation. The assurance covered the very place which was unsafe and where plaintiff fell. Nor was the effect of the assurance of safety destroyed by the interval of time that elapsed between the giving of the assurance and the breaking of the plate, because the progress of the work had not changed conditions. Because the roof had been removed from room No. 5 did not render the valley between rooms 4 and 5 less safe. Apparently there was less weight on this valley at the time of the accident than when the assurances were given. And the president admits that the breaking of the plate was occasioned by its decay and not by the advanced stage of the work. On cross-examination he was asked this question:

"Q. If the plate had been sound timber it would not have broken, would it; the taking off of the sheeting would not have caused it to break?

Objected to and objections overruled.

"A. No, sir; not if it had been sound."

The evidence did not show that the progress of the work affected the dangerous condition of the plate, but if it did, the president knew at the time the assurances were given that in the progress of the work, done according to his instructions, a stage would be reached when the plate would become unsafe. And yet, knowing of the condition of the plate, he not only took no steps to make it safe but negligently assured the servants that the place was safe. It is useless to pursue this branch of the case farther. The general doctrine as to the effect of an assurance of safety is thus stated in 4 Labatt on Master and Servant (2 Ed.), sec. 1373: "If the servant is shown to have entered upon the performance of certain work, or continued to perform that work, relying upon an assurance of his master or

his master's representative that such work would not unduly imperil his safety, the mere fact that, before he received the assurance, his apprehensions as to the possibility of injury had been excited by circumstances which had come to his knowledge, will not, as matter of law, render him chargeable, either with an assumption of the risk involved in the work, or with contributory negligence.''

Plaintiff's petition is not open to the charge of insufficiency because it failed to allege that plaintiff could not have discovered the defective condition of the plate by the exercise of ordinary care. The petition charged that plaintiff did not know of the dangerous condition, that defendant did know of it and assured plaintiff it was safe and plaintiff relied thereon. Under these circumstances plaintiff was not bound to search for danger but had a right to rely on defendant's assurance. [Sullivan v. Railroad, 107 Mo. 66, l. c. 78; Meilly v. Railroad, 215 Mo. 567, l. c. 588; Swearingen v. Mining Co., 212 Mo. 524, l. c. 538.]

In the examination of the panel of jurors on their *voir dire,* plaintiff asked a question as to their relations with any liability insurance company. Defendant objected and moved to discharge the jury. Thereupon, out of the presence and hearing of the jury, the court inquired of defendant's counsel if he denied that an indemnity company was defending the case. Counsel replied that an indemnity company was defending the case to a certain extent and that it was proper to ask only with reference to a specific liability insurance company. The court then asked plaintiff's counsel if he knew the name of the company and counsel replied that he did not; that defendant's counsel, in telling him of the insurance company, did not tell him the name. Upon receiving this information, the court overruled the objection. It thus seems that there was an insurance company interested in the outcome of the case but the particular company was unknown to plaintiff.

In Meyer v. Gundlach, etc., Co., 67 Mo. App. 389, 1. c. 391-2, it was held that "it was clearly proper for plaintiff's counsel to ascertain fully the situation of the juror as to parties interested in the suit, to enable him to exercise his statutory right of peremptory challenge, as well as to lay ground for challenges for cause. At the time the question was put, counsel gave as his reason that he was informed that the party named was the real defendant in this action, and appealed to defendant's counsel for the correctness of this assumption. The court then called attention to this appeal and stated to defendant's counsel if the interest of said third party was not denied, the proposed question was proper. The counsel for defendant by his reply virtually admitted the interest of said third party in the litigation. Under this state of facts it cannot be held that defendant was prejudiced by the remarks of the court or plaintiff's counsel, and the first assignment of error is, therefore, overruled." In Saller v. Shoe Co., 130 Mo. App. 712, 1. c. 720, it is said "counsel have the right to probe a proposed juror to the bottom, for the purpose of ascertaining whether or not his social or business relations, etc., are such as would probably prejudice him against a recovery in the character of case to be tried. The method of examination of jurors on their *voir dire* pursued by plaintiff's counsel was approved in the following cases: Faber v. Reiss Coal Co., 102 N. W. 1049; Chybowski v. Bucyrus Co., 106 N. W. 833; Foley v. Cudahy Packing Co., 119 Iowa, 246; Iroquois Furnace Co. v. McCrea, 191 Ill. 340; O'Hare v. Railroad Company, 139 Ill. 151." In M. O'Connor Co. v. Gillaspy, 83 N. E. 738, the plaintiff did not merely ask one general question, as was done in the case at bar, but asked each juror separately and there was nothing in the record to show whether an insurance company was interested in the case or not. On this point the court at page 739, said: "Parties litigant in cases of this class are entitled to a

trial by a thoroughly impartial jury, and have a right to make such preliminary inquiries of the juries as may seem reasonably necessary to elucidate their impartiality and disinterestedness. In the exercise of this right counsel must be allowed some latitude to be regulated in the sound discretion of the trial court according to the nature and attendant circumstances of each particular case. The examination of jurors on their *voir dire* is not only for the purpose of exposing grounds of challenge for cause, if any exist, but also to elicit such facts as will enable counsel to exercise their right of peremptory challenge intelligently. Questions addressed to this end are not barred, though directed to matters not in issue, provided they are pertinent, and made in good faith." To the same effect are Cripple Creek Mining Co. v. Brabunt, 37 Colo. 423; Spoonick v. Backus-Brooks Co., 89 Minn. 354; Swift v. Platte, 68 Kan. 10; Girard v. Grosvenordale Co., 82 Conn. 271; Grant v. National Ry. Spring Co., 191 N. Y. Supp. 805. From these authorities it appears that if the inquiry is made in good faith and is not conducted beyond unreasonable limits, the discretion of the trial court will not be interfered with. In the case of Gore v. Brockman, 138 Mo. App. 231, the question could not be justified on the ground of *voir dire* examination since it was not asked of a prospective juror but of the defendant, a witness in the case, and clearly it was not in good faith but was asked for the purpose of injecting a false issue in the case. So it was in the case of Trent v. Printing Co., 141 Mo. App. 437, and also in the cases of McCarthy v. Spring Valley Coal Co., 232 Ill. 473; Lambert v. Daly, 80 Miss. 340; Munigold v. Black River Traction Co., 80 N. Y. Supp. 861; Hollis v. United States Glass Co., 220 Pa. St. 49. In all of the cases holding such evidence to be reversible error the objectionable matter was introduced by way of evidence or statements of counsel and the *sole purpose* was to get before the jury the fact that an insur-

ance company would eventually pay the judgment, and the testimony offered had no bearing upon any issue. In this case, however, as to the question asked the jurors on their *voir dire,* we cannot say it was asked in bad faith, especially as it was but a single question, carrying with it no intimation as to what effect it had upon defendant's fortunes, and did not tell them anything more than they would have known as intelligent men, i. e., that in all probability defendant carried indemnity insurance.

During the trial of the case, and somewhat near its close, defendant's president, while on the stand, was asked as to indemnity insurance. But by this time, *the question was a pertinent one bearing directly on the question whether the Sheffield Ice Company was the company having the building dismantled.*

In defendant's answer, and in the opening statement it was denied that plaintiff was sent on the building by defendant or by anyone representing the defendant. The defendant's president had testified that the Sheffield Ice Company did not own the ice house being torn down, and that Ben Myers, the foreman in charge at the time of the accident, was not foreman of the Sheffield Ice Company. In addition to this there was some question whether or not the work was not in fact being done by the Bean Lake Ice Company acting through Mr. Garlock who happened to be the president of the Sheffield Ice Company. In this state of affairs, Garlock was asked this question:

Q. I will ask you if it is not a fact that the Sheffield Ice Company took out a policy of indemnity insurance covering the liability of these men working on the razing of this building?

Mr. Porter: I object to that question for the reason—

Mr. Hill: I ask this question for the purpose of showing that the Sheffield Ice Company was engaged in employing these men to do this work.

Mr. Porter: That question is objected to for the reason that if the Sheffield Ice Company did take out any insurance indemnifying the men, the policy of insurance is the best evidence of whether that fact exists; and the further objection is made that it is immaterial in this case.

The Court: Sustained on the first ground.

Mr. Porter: And the defendant moves the court to discharge the jury for the reason that the plaintiff has, of his own accord, asked the question and in that question has solicited information as to whether this defendant carries a policy of indemnity insurance covering the plaintiff in this case.

The Court: It seems to me that the question is a pertinent question. Your attitude has been throughout that these men were not your servants; at least I took that from your opening statement and your attitude throughout the trial, and if that be your attitude this would be a pertinent question as tending to show for whom they were working.

Mr. Hill: That is what I asked it for.

The Court: The objection to the question is sustained and the motion to discharge the jury is overruled.

To further reasons given why the motion to discharge the jury should be sustained, the trial court ruled that the motion to discharge was overruled because of the attitude of defendant apparently disclaiming the fact that plaintiff was in its employ and that this was a matter that in the opening statement and in the attitude of the defendant throughout the trial had been controverted and the question would have been competent if offered in proper form.

Upon the issue of whether or not the Sheffield Ice Company was tearng down the building and not the Bean Lake Ice Company, evidence that the Sheffield Ice Company took out indemnity insurance covering the liability of the men engaged upon this particular

building would be of strong probative value going to show that it was doing the work. Under such circumstances, the question, though ordinarily inadmissible, and its asking would constitute reversible error, yet, inasmuch as it was competent on one issue, it was not error to ask it. Evidence is admissible if it tends to prove one issue even though it is not admissible to prove another issue and is prejudicial upon such latter issue. It is admissible if competent upon any material controverted fact. [State v. Phillips, 24 Mo. 475; Bailey v. Kansas City, 189 Mo. 503.] In Wabash Screen Door v. Black, 126 Fed. 721, evidence that a witness went to the hospital at the instance of an indemnity insurance company was admissible because it bore on his credibility, although objected to as prejudicial. In the case of M. O'Connor v. Gillaspy, 83 N. E. 738, it was held that where the question objected to bore on a controverted issue this was sufficient to acquit counsel of the charge of bad faith in asking such question. In Self v. White, 169 Mo. App. 709, 155 S. W. 840, it was held by this court, in an opinion written by ELLISON, P. J., that evidence conveying information that an indemnity insurance company was the real defendant could not be deemed reversible error since at the time the evidence was offered it bore on an issue in the case.

In Brower v. Tunrick, 66 Kan. 770, l. c. 771, the defendant was required to testify on cross-examination and over the objection of defendant's counsel that he insured against accidents to his employees and that the insurance company employed the lawyers and defended that case. The court held the evidence was admissible and proper inasmuch as the defendant denied employing the defendant. In Barg v. Bonsfield, 65 Minn. 355, the court held that evidence that defendant carried an indemnity policy on its servants, including plaintiff, was proper in view of the fact defendant had contended plaintiff was not defendant's servant. The

court said that the evidence was highly prejudicial and that it was certainly error to admit it unless it was competent on the issue named, and, being so, its admission was not error. [To the same effect see Finkbine Lumber Co. v. Cunningham, 57 So. Rep. 916; Robinson v. Hill, 111 Pac. Rep. 871.] In Grant v. National Ry. Spring Co., 91 N. Y. Supp. 805, l. c. 807, it is said, speaking of a decision of the New York Court of Appeals in Cosselman v. Dunfee, 172 N. Y. 507, it is "the asking of a question clearly incompetent and not for the purpose of eliciting any material evidence, but with the ulterior design of disclosing the fact that an insurance company is interested in the litigation, that is condemned. It is only when the question is incompetent and immaterial, however, that the motive of counsel is to be considered."

In view of the foregoing authorities and the circumstances under which the question objected to was asked, we cannot say it was asked in bad faith or was not pertinent to the issue as to plaintiff's employment.

Neither can we say that the verdict was excessive. At the time of his fall plaintiff was a stout healthy boy eighteen years old. The fall broke his hip, rendered him unconscious in which state he remained most of the time for a week. He was in bed for five weeks. His kidneys were injured and passed blood for two weeks and so did his bowels. At the time of the trial his kidneys still were affected. His weight went down from 142½ to 129 pounds. Since the accident he has been nervous and restless, able to do light work only. The hip bone was fractured at the top part or crest and at a place which helps to support the weight of the body. Twelve men saw the plaintiff and learned the nature of his injuries and fixed his damages at $6000. The trial judge approved the verdict. We cannot say it was excessive. The judgment is affirmed. All concur.