Kelly POPE, Respondent,

v.

Lester POPE, et al., Defendants,

Joel S. Ray, Ph.D., Appellant,

Bruce Strnad, Ph.D., Defendant.

No. WD 63997.

Missouri Court of Appeals,
Western District,
En Banc.

Dec. 20, 2005.

Priscilla F. Gunn, St. Louis, MO, for appellant and defendant Strnad.

Daniel H. Miller, Columbia, MO, for respondent Pope.

Before EDWIN H. SMITH, Chief Judge, HAROLD L. LOWENSTEIN, Judge, ROBERT G. ULRICH, Judge, PATRICIA BRECKENRIDGE, Judge, PAUL M. SPINDEN, Judge, JAMES M. SMART, JR., Judge, JOSEPH M. ELLIS, Judge, VICTOR C. HOWARD, Judge, THOMAS H. NEWTON, Judge, RONALD R. HOLLIGER, Judge, and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Judge.

Joel S. Ray, Ph.D. ("Dr. Ray") appeals a judgment against him and in favor of Kelly Pope ("Ms. Pope") in the amount of $10,668,344. Ms. Pope, who had been the victim of severe sexual abuse perpetrated by her adoptive father, Lester Pope ("Lester"), recovered against Dr. Ray on the theory that he was liable for the negligence of his partner, Bruce N. Strnad, Ph.D. ("Dr. Strnad"), a licensed psychologist who had treated Lester and knew of his proclivity to sexually abuse Ms. Pope, but failed to warn anyone of the ongoing danger presented to her by Lester.

## I. Procedural History

In March 1991, Norma Bradley filed an application requesting that the court appoint her as Ms. Pope's next friend to pursue civil litigation relating to the sexual abuse. The application was granted. Thereafter, Ms. Bradley, as next friend of Ms. Pope, filed a petition in tort naming Lester, Lester's ex-wife Nancy Copin ("Nancy"), and Dr. Ray as defendants, seeking money damages for the serious physical and psychological injuries Ms. Pope had sustained as a result of her prolonged sexual abuse by Lester. We need not detail all of the extensive procedural history of the case. It suffices to say that there were numerous dismissals, refilings, a prior appeal to this court (*see Bradley v. Ray*, 904 S.W.2d 302 (Mo.App. W.D.1995)), and other procedural complexities until May 10, 1999. On that date, Ms. Pope, having attained the age of majority, filed a petition in tort against Lester, Nancy, Dr. Ray, and a yet-to-be-appointed defendant ad litem for Dr. Strnad.[1] Count I of the petition set forth claims against all defendants for aiding and abetting the commission of the intentional tort of child abuse. Count II alleged that Nancy had negligently failed to discover Ms. Pope's sexual abuse earlier than she did. Count III asserted common law negligence for failure to warn of suspected child abuse against Nancy, Dr. Ray, and the defendant ad litem for Dr. Strnad. Counts IV and V alleged claims against Dr. Ray and the defendant ad litem for Dr. Strnad for negligence *per se* and prima facie tort. The petition also sought punitive damages against Dr. Ray and the defendant ad litem for Dr. Strnad on Counts III, IV, and V, as well as punitive damages against Nancy on Count III.

On June 4, 1999, Dr. Ray filed a motion to dismiss Counts I, IV, and V based on our opinion in the prior appeal, which the trial court subsequently granted. Mrs. Strnad was appointed as defendant ad litem for Dr. Strnad, and, on April 10, 2002, she and Ms. Pope entered into a section 537.065 agreement wherein they agreed to submit all claims against Dr. Strnad to binding arbitration before a panel of three arbitrators pursuant to section 435.012 *et seq.*[2] The agreement also provided, *inter alia*, that Ms. Pope would dismiss her claim for punitive damages against Dr. Ray. Finally, as further provided in the agreement, on July 15, 2002, Mrs. Strnad resigned as defendant ad litem for Dr. Strnad and C. Robert Buckley was substituted to serve as her replacement.

Trial began on September 16, 2003. As provided in her agreement with Mrs. Strnad, at the beginning of trial Ms. Pope dismissed her claim for punitive damages against Dr. Ray. Before the case was submitted to the jury, Ms. Pope dismissed her claims against Lester and Nancy, choosing to proceed solely against Dr. Ray as origi-

---

1. This was necessary since Dr. Strnad had died in 1993.

2. All statutory references are to RSMo 2000.

nally pled in Count III. Dr. Ray's motions for a directed verdict at the close of the plaintiff's case in chief and at the close of all the evidence were denied, and the jury returned a unanimous verdict in favor of Ms. Pope and against Dr. Ray in the amount of $3 million in past non-economic damages and $2 million in future non-economic damages sustained by her after January 23, 1988. In accordance with the jury's verdict, the trial court orally entered judgment in favor of Ms. Pope and against Dr. Ray in the amount of $5 million.

Both parties to the instant appeal filed a variety of post-trial motions, none of which are pertinent at this time. On March 12, 2004, the trial court entered its final judgment in favor of Ms. Pope and against Dr. Ray in the amount of $10,668,344, consisting of $3 million in past non-economic damages, $2 million in future non-economic damages, and $5,668,344 in pre-judgment interest. In accordance with the arbitrators' award of February 13, 2004, the trial court also entered judgment against the defendant ad litem for Dr. Strnad (Mr. Buckley) in the amount of $17,056,119.20, consisting of $3 million in past non-economic damages, $5 million in future non-economic damages, and $9,056,119.20 in pre-judgment interest.

This appeal by Dr. Ray followed.[3] After the case was briefed, it was originally heard in division, but before decision and on its own motion, this court granted re-hearing *en banc* and requested that the parties file supplemental letter briefs addressing certain additional questions.[4]

## II. Facts

Viewing the evidence adduced at trial in the light most favorable to the jury's verdict, giving the prevailing party below all reasonable inferences from the verdict, and disregarding the unfavorable evidence, *Joel Bianco Kawasaki Plus v. Meramec Valley Bank,* 81 S.W.3d 528, 537 (Mo. banc 2002), as is required where, as here, there is a challenge to the sufficiency of the evidence supporting the verdict, *Scanwell Freight Express STL, Inc. v. Chan,* 162 S.W.3d 477, 478 (Mo. banc 2005), or a claim that the trial court erred in failing to enter either a directed verdict or a JNOV, *Nemani v. St. Louis Univ.,* 33 S.W.3d 184, 185 (Mo. banc 2000), the facts are as follows.

Lester and Nancy were married in August 1967. In 1979, at the age of three, Ms. Pope, who was born on August 26, 1976, began living with the couple as their foster child. Ms. Pope was adopted by Lester and Nancy two years later, when she was five years old. Lester began sexually molesting Ms. Pope in 1980, when she was four years old. This sexual abuse,

---

**3.** Mr. Buckley also filed a notice of appeal on March 29, 2004, but later filed a motion to dismiss his appeal, which we sustained on April 14, 2004.

**4.** These questions were:
1. If the existence of a partnership was alleged in Plaintiff's Petition, and the Defendant's Answer contained a general denial of that allegation, was Rule 55.14 applicable to this case?
2. If Rule 55.14 applied, can it be waived, and if so, was there a waiver in this case?
3. If Plaintiff did not raise or invoke Rule 55.14 at trial or on appeal, what effect, if any, does that have on disposition of this appeal?
4. Were Defendant's motions for directed verdict and JNOV sufficiently specific to preserve for purposes of appeal the issue of the sufficiency of the evidence of partnership?
5. If Plaintiff did not raise or argue the issue that Defendant's motions for directed verdict and for JNOV were not sufficiently specific to preserve for purposes of appeal the issue of the sufficiency of the evidence of partnership, what effect, if any, does that have on disposition of this appeal?

which was pervasive and severe, continued until the spring or early summer of 1989, when Ms. Pope was twelve years old.

During the course of their marriage, Lester and Nancy separated on several occasions. On January 23, 1988, at the conclusion of one of these separations, Nancy returned to the marital home and found that the door to the library/study was locked. Nancy broke into the room and discovered pictures of Ms. Pope, which she found in a locked briefcase belonging to Lester. As depicted in the photographs, Ms. Pope was dressed in a see-through negligee that was entirely inappropriate for a child of her age to be wearing. In a filing cabinet located within the room, Nancy also found a sheer, negligee-type outfit.

When Nancy asked Ms. Pope about the pictures, Ms. Pope disclosed to her that she and Lester had been having sexual contact. Nancy then went to a neighbor's house and called Dr. Ray, a friend and a licensed psychologist for whom she had previously worked and with whom she had had other social and professional relationships, using his home telephone number. Even though it was a Sunday afternoon, Dr. Ray, who with Dr. Strnad were the principals of Columbia Psychological Associates in Columbia, Missouri, told Nancy to meet him and Dr. Strnad at their office. Dr. Ray and Dr. Strnad counseled Nancy for approximately thirty minutes. During what the billing statement associated with this event referred to as a "Crisis Intervention" session, Nancy told Drs. Ray and Strnad about the pictures of Ms. Pope and also told them that Lester had been sexually abusing Ms. Pope. Dr. Ray decided it would be necessary for the Pope family to confront Lester about the abuse and to tell him that if he sought professional help, the family would stand behind him, but that if he refused to get such treatment, the fami-

ly would have him arrested. Dr. Ray expressly acknowledged that if a male sexual abuser such as Lester does not receive proper treatment and is placed in the presence of young females, there is a "high probability" that he will abuse again. However, neither Dr. Ray nor Dr. Strnad reported the information they had received from Nancy to the Division of Family Services or the police department.

Shortly after the January 23 session with Drs. Ray and Strnad, Nancy and the rest of the Pope family confronted Lester. Nancy informed Lester that if he did not seek counseling with Dr. Strnad, she would have him arrested. Nancy also told Lester to apologize to Ms. Pope, which he did. On the condition that Nancy not contact law enforcement authorities, Lester promised to visit Dr. Strnad for therapy and not to have any further sexual contact with Ms. Pope.

On January 26, 1988, Lester began attending counseling sessions with Dr. Strnad, during the course of which Lester admitted that he had been sexually molesting Ms. Pope for a number of years. When Lester asked Dr. Strnad, during the first such session, if Dr. Strnad would keep his sexual abuse of Ms. Pope confidential because he was concerned about his image in the community (he had been a professor at the University of Missouri and was well known in Columbia), Dr. Strnad told him he would, and this was reflected in his notes for the session. Lester stopped seeing Dr. Strnad after attending from four to six therapy sessions. Dr. Strnad never reported Ms. Pope's sexual abuse by Lester, which Lester had admitted committing during the therapy sessions, to the proper authorities. Sometime later, Nancy decided to end her marriage to Lester, so she visited Columbia Psychological Associates to talk with Dr. Strnad about her decision.

However, she was surprised to be told that he was no longer doing counseling.

Lester continued sexually abusing Ms. Pope until the spring or early summer of 1989, around the time Nancy and Lester's divorce became final. Meanwhile, between January 23, 1988 (when Nancy initially reported Lester's sexual abuse of Ms. Pope to Drs. Ray and Strnad) and the spring or early summer of 1989 (when Lester finally stopped sexually abusing Ms. Pope), Lester sexually abused Ms. Pope "a bunch" of times, including four specific instances she could recall in detail, such as where Lester masturbated over Ms. Pope and ejaculated onto her naked body after directing her to undress and lie down. During this period, Ms. Pope would look out the window at the sun while being sexually violated, wishing "that God or something would come in there and, you know, say 'Stop doing this.'" At trial, Dr. Ray acknowledged it was "quite likely" that, due to Lester's continued sexual abuse of Ms. Pope during this period, she would suffer psychological damage for the rest of her life.

In November 1989, Nancy took Ms. Pope back to Columbia Psychological Associates to address various behavioral problems Ms. Pope was having at home and at school, including difficulties getting along with Nancy, difficulty relating to her peers, and emotional issues pertaining to her prior sexual molestation by Lester. There, Nancy and Ms. Pope visited Lynn Ogden, a clinical social worker employed at Columbia Psychological Associates, for counseling. During these counseling sessions, both Nancy and Ms. Pope informed Ms. Ogden about Ms. Pope's sexual abuse by Lester. Ms. Ogden told Nancy and Ms. Pope she was going to make a hotline report to the Boone County Division of Family Services regarding her suspicions that Ms. Pope had been sexually abused by Lester. On December 4, 1989, Ms. Ogden also informed Drs. Ray and Strnad that she was going to make such a report, explaining that she regretted any adverse impact that might have on them. The following day (December 5, 1989), Ms. Ogden called the child abuse hotline and reported the suspected abuse.

After receiving Ms. Ogden's call, the Division of Family Services immediately contacted the Boone County Sheriff's Department to investigate the allegations. Shortly thereafter, a SAFE-trained physician with the Boone County Health Department, Dr. Kivlahan, performed a detailed sexual assault examination on Ms. Pope, which revealed that she had a "very positive" history of sexual molestation, which was corroborated by several photographs taken by Dr. Kivlahan showing a severely traumatized vaginal area consistent with sexual abuse. The examination also showed that Ms. Pope had contracted a communicable venereal disease (chlamydia) and was also suffering from abdominal pelvic pain, dysuria, vaginal itching, vaginal discharge, and vaginal bleeding. It further revealed that Ms. Pope was also having sleeping and eating disturbances, was acting out sexually, and was experiencing fear, anger, and depression arising from her sexual abuse. At trial, Dr. Ray agreed that Ms. Pope's sexual abuse would have stopped in January 1988 had the investigation (and related medical examination) taken place then, rather than in December 1989.

As a further result of the investigation commenced by the Boone County Sheriff's Department in December 1989, during which it was determined that neither Dr. Ray nor Dr. Strnad had ever contacted appropriate authorities regarding what they had been told about Ms. Pope's sexual abuse, Lester was arrested and charged with three counts of sodomy and one count

of attempted rape. He eventually pled guilty to one count of sodomy and was sentenced to a nine-year term of imprisonment, but was paroled in 1996 after serving a total of about five years.

As to the existence of a partnership involving Drs. Ray and Strnad, which had been alleged in Count III of Ms. Pope's May 10, 1999 petition, the evidence supporting the jury's verdict was as follows. Dr. Ray conceded that he and Dr. Strnad practiced psychology together in an affiliation known as Columbia Psychological Associates, which they had jointly operated for the purpose of making a profit for nearly ten years until Dr. Strnad's death in 1993. Dr. Ray also admitted that he and Dr. Strnad shared the cost of such business-related charges and expenses as office rent, utility service, staff salaries, and the like, and was told by someone (presumably by Dr. Strnad) at the end of each week "what size check [he] had to cut" to cover his share. Furthermore, Dr. Ray testified that *"we* had four people working full time in *our* office" and never actually affirmatively and unequivocally denied that he and Dr. Strnad had been partners. In fact, when asked, on cross-examination by counsel for Dr. Strnad's defendant ad litem (Mr. Buckley), whether he was denying that he and Dr. Strnad had been partners, Dr. Ray gave the following reply: "I'm not quite sure how to frame an answer to that."

On January 26, 1988, Columbia Psychological Associates sent Lester a bill in the amount of $80 "for professional services rendered by Dr. Bruce N. Strnad and Dr. Joel S. Ray" during their January 23, 1988 crisis intervention session with Nancy, which was admitted into evidence as Exhibit 4. A week later (February 2, 1988), Columbia Psychological Associates sent Lester another bill, this one in the amount of $40 "for professional services rendered by Dr. Joel S. Ray" on January 23, 1988, which was admitted into evidence as Exhibit 3. Exhibits 3 and 4 both contain the preprinted names "Joel S. Ray, Ph.D." and "Bruce N. Strnad, Ph.D." in the upper left hand corner.[5] In the upper right hand corner is a single telephone number, under which a single entry, "Tax ID # 43–1271070," appears. Just below and to the left of the telephone and tax ID number is "Columbia Psychological Associates," under which is the street address "10 N. Garth Ave., Columbia, MO 65203."

Two witnesses, both of whom had experience in interpreting tax identification numbers, testified about the significance of the tax ID number corresponding to Columbia Psychological Associates. Detective Andy Anderson of the Boone County Sheriff's Department testified that the tax ID number for a business entity generally begins with the prefix "43" and that 43–1271070 was *not* the tax ID number for an self-employed individual, which typically consists of the individual's Social Security Number.[6] After examining Exhibits 3 and

5. Neither Exhibit 3 nor Exhibit 4 directed the addressee and recipient (Lester) to pay Drs. Ray and Strnad directly, separately, or in their own names for the professional services they rendered during their January 23, 1988 crisis intervention session with Nancy. Instead, they directed Lester to send a single payment of $80 to Columbia Psychological Associates at its Columbia, Missouri, street address. At trial, Dr. Ray claimed that he did not request that either of these bills be pre-

pared and didn't know who at Columbia Psychological Services had prepared or sent them. He also insisted that he had never rendered any professional services to Nancy and that Nancy had never been a client of his.

6. As further evidence along those general lines, we also note that during two separate investigatory interviews conducted by Detective Anderson on December 15, 1989 and January 9, 1990, Dr. Strnad did not say he was self-employed, but told Detective

4, Tim Schultz, a certified public accountant with substantial experience in the areas of partnerships and partnership accounting, further testified that because its tax ID number was 43–1271070, Columbia Psychological Associates was, in all probability, either a corporation or a partnership. Meanwhile, Dr. Ray testified that Columbia Psychological Associates was *not* a corporation.

Exhibit 17, the renewal endorsement page of a "Psychologists Professional Liability Policy" providing insurance coverage to Drs. Ray and Strnad d/b/a Columbia Psychological Associates for the period between January 1, 1988, and January 1, 1989, was also introduced by Ms. Pope and admitted into evidence. The endorsement page, which is dated January 18, 1988, lists the "name and address of insured" as "Joel S. Ray, Ph.D., et al., dba Columbia Psychologcial [sic] Associates, 10 North Garth, Columbia, MO 65201." The "additional named insureds" are listed as "Joel S. Ray, Ph.D." and "Bruce N. Strnad, Ph.D.," and the endorsement page states that the "type of org[anization]" covered by the policy is a "Partnership." When cross-examined by plaintiff's counsel concerning Exhibit 17, Dr. Ray acknowledged that he had represented to the entity that had prepared Exhibit 17 that he and Dr. Strnad were partners.

Furthermore, Ms. Ogden testified that she had approached Drs. Ray and Strnad seeking to join their partnership, which she knew as Columbia Psychological Associates. Because she did not want to assume any pre-existing partnership liabilities and had received legal advice to the effect that any written agreement adding her as a third partner needed to contain a provision holding her harmless for the prior acts of Columbia Psychological Associates, Ms. Ogden requested such a release, but Drs. Ray and Strnad refused to provide one and the negotiations collapsed. Finally, during her video deposition, which was played to the jury, Nancy stated that she was aware that Dr. Ray and Dr. Strnad were partners—not because they had specifically told her that, but because it was "general knowledge if you looked in the phone book or anything else."

### III. Analysis

In his first point on appeal, Dr. Ray asserts that the trial court erred in submitting verdict-directing Instruction No. 7 and in failing to grant his motions for directed verdict and for JNOV because insufficient evidence was presented to the jury to support its finding that Drs. Ray and Strnad had entered into a partnership known as Columbia Psychological Associates.[7]

Before considering this point on the merits, "[w]e are first required to determine, sua sponte, whether any of these issues are preserved for our review[.]" *State v. Bainter,* 608 S.W.2d 429, 430 (Mo. App. E.D.1980). Rule 84.13(a) authorizes appellate courts to consider questions of subject matter jurisdiction, and "questions

---

Anderson that he (Dr. Strnad) was employed by Columbia Psychological Associates. Detective Anderson duly noted this on the two *"Miranda* waiver forms" he prepared, which were offered and admitted into evidence as Exhibits 5 and 6.

**7.** Paragraph First of verdict-directing Instruction No. 7 hypothesized that "Defendant Ray and Dr. Strnad, by words and conduct, entered into a partnership known as Columbia Psychological Associates." Instruction No. 7 also informed the jury that "[t]he term 'partnership' as used in this instruction means an association of two or more persons to carry on as co-owners of a business for profit." This is the statutory definition of a partnership under Missouri's Uniform Partnership Law. *§ 358.060.1.*

as to the sufficiency of the pleadings to state a claim ... *or a legal defense to a claim* " even if those issues are "not briefed or not properly briefed." (emphasis added). *See, e.g., Cramer v. Carver*, 125 S.W.3d 373, 375–76 (Mo.App. W.D.2004) (appellate court raised, *sua sponte*, the issue of whether the appellant's motion to set aside under Rule 74.05(d) presented anything for the trial court's consideration because, if not, the appeal "presents nothing for our review, requiring us to dismiss."); *State v. Lubbers*, 81 S.W.3d 156, 160 (Mo.App. E.D.2002) (appellate court conducted *sua sponte* preservation determination even though State did not question whether defendant preserved her claims of error for appellate review).

■■■ Dr. Ray's Point I challenges the sufficiency of the evidence to support a finding of partnership.

To preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion for a new trial or to set aside a verdict must assign as error the trial court's failure to have directed such a verdict. Failure to move for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to prove a submissible case. Similarly, a motion for directed verdict that does not comply with the requirements of Rule 72.01(a) neither presents a basis for relief in the trial court nor preserves the issue in the appellate court.

*Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 163 (Mo.App. W.D. *en banc* 1997) (internal citations omitted).

■■■ Rule 72.01 authorizes motions for directed verdict and for judgment notwithstanding the verdict. Since January 1, 1975,[8] Rule 72.01(a) has provided that "[a] motion for directed verdict shall state the specific grounds therefor."[9] Similarly, Rule 72.01(b) declares that "a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict." Where an insufficient motion for directed verdict has been made, a subsequent post-verdict motion is without basis and preserves nothing for review. *Letz*, 975 S.W.2d at 163.

■■■ Dr. Ray filed Motions for Directed Verdict at the close of plaintiff's case and also at the close of all the evidence. The grounds for both motions were identical.[10] They were:

8. "Rule 72, Motion for Directed Verdict and After Trial Motions, consisting of subdivisions 72.01 and 72.02 was repealed by Order of the Supreme Court dated April 10, 1974 and a new Rule 72, Motion for a Directed Verdict and for Judgment Notwithstanding the Verdict, was adopted in lieu thereof consisting of 72.01, effective January 1, 1975." *Missouri Rules of Court* 505 (1975); *I Missouri Court Rules* 316 (2005).

9. As observed by the Advisory Committee which helped draft the new version of Rule 72, this language did not appear in the old Rule 72: "The following sentence was not in prior Rule 72.01: 'A motion for directed verdict shall state the specific grounds there-

for.' " Committee Note—1974, *Missouri Rules of Court* 507 (1975). Other significant changes to Rule 72 were also made at this time. *Compare Missouri Rules of Court* 472–73 (1974) *with Missouri Rules of Court* 505–07 (1975).

10. "After the trial court overruled appellants' motion for directed verdict at the close of respondent's case, appellants chose to present evidence. By presenting evidence, appellants waived any error in denying the motion for directed verdict at the close of respondent's case in chief." *Powell v. Hickman*, 793 S.W.2d 885, 891 (Mo.App. W.D.1990). Accordingly, we must "confine[] our review of any alleged error with respect to such mo-

1. Plaintiff has failed to prove a submissible case against this Defendant.
2. Plaintiff failed to produce legally sufficient evidence that this Defendant violated any duty to Plaintiff.
3. Plaintiff failed to produce any evidence which would establish that any act of this Defendant caused or contributed to cause any damage allegedly sustained by Plaintiff.
4. Plaintiff failed to prove any actionable negligence against this Defendant.
5. Plaintiff failed to produce legally sufficient evidence that this Defendant's conduct fell below the appropriate standard of care.

As can be seen, the Motion for Directed Verdict at the close of all the evidence contains no specific grounds relating to the sufficiency of the evidence regarding the partnership and the consequent vicarious liability. In particular, the motion does not state the specific grounds which are now posited by Dr. Ray on appeal in Point I, namely that Dr. Ray could not properly be adjudged to have been "vicariously liable for the negligent acts of Dr. Strnad" because "there was insufficient evidence to support a finding of partnership" between Drs. Ray and Strnad. Indeed, Dr. Ray's motions do not even contain the word "partnership." Moreover, the record reflects that, although expressly invited to do so by the trial court, defense counsel made no argument on the motions and thus did not orally elaborate on the basis for the general claims of error. In short, the motion for directed verdict Dr. Ray presented to the trial court at the close of all the evidence consisted of nothing more than boilerplate generalities and naked conclusions, which, as the following cases from all three districts of the Court of

Appeals make perfectly clear, preserved nothing for appellate review.

We begin with *Letz v. Turbomeca Engine Corp.*, *supra*, where this court held that the appellants failed to preserve the issue of submissibility of aggravating circumstances for review. *Letz*, 975 S.W.2d at 163–64. We noted that the defendant's motions for directed verdict asserted that the plaintiffs had "failed to prove their claims of negligence and strict liability in the design, manufacture, sale, or installation" of a critical part. *Id.* at 164. Observing that the motions did not raise the issue of submissibility of aggravating circumstances as required by Rule 72.01(a), this court held that the motions "were insufficient to preserve the issue of submissibility of aggravating circumstances for appellate review." *Id.*

*Kincaid Enterprises, Inc. v. Porter*, 812 S.W.2d 892 (Mo.App. W.D.1991), is also instructive. In that case, the defendant's motion for directed verdict at the close of all the evidence asserted:

1. That Plaintiffs [sic] petition fails to state the facts efficient [sic] to constitute a claim or cause of action against the Defendant upon which relief can be granted.
2. The evidence fails to establish or prove a *prima facie* case against the Defendant.
3. Under the law and Plaintiffs [sic] evidence, Plaintiff is not entitled to recover damages against the Defendant.

*Id.* at 895 (brackets in original). After quoting Rule 72.01(a) and observing that "[a] motion for directed verdict that does not conform to the rules presents no basis for relief in the trial court nor preserves

tions to the motion for a directed verdict offered at the close of all the evidence." *New-*

*combe v. Farmer*, 360 S.W.2d 272, 276 (Mo. App. E.D.1962).

the issue in the appellate court," Judge Shangler, writing for this court, declared: "These are conclusions and bare generality, and not specific grounds as to why the defendant is entitled to relief and judgment by directed verdict." *Id.* The court went on to say that "[t]hey do not even suggest ... any ... definite ground sufficient to invoke either a directed verdict or a judgment notwithstanding verdict." *Id.*

Likewise, in *McRaven v. F–Stop Photo Labs, Inc.,* 660 S.W.2d 459, 460 (Mo.App. S.D.1983), the appellant complained that the trial court erred in denying its motion for directed verdict at the close of all the evidence. The grounds stated in the motion were:

> that the evidence was insufficient in law to support or form a basis for a verdict in favor of plaintiffs, that plaintiffs failed to make a submissible case, that no evidence was adduced which raised a jury question on whether or not garnishee's policy afforded coverage and that, as a matter of law, there was no policy coverage.

*Id.* at 460–61. The Southern District rejected the appellant's contention, stating:

> These bare generalities, contrary to rule mandates, do not approach stating "specific grounds" as to why the motion for directed verdict should have been sustained. Such nonspecifics, all of which boil down to a contention that plaintiffs failed to make a submissible case, were wholly insufficient to preserve anything for appellate review.

*Id.* at 461.

Similarly, in *Trimble v. Pracna,* 51 S.W.3d 481, 501 (Mo.App. S.D.2001), the court noted that a defendant's "failure to state specific grounds in a motion for directed verdict preserves nothing for consideration by an appellate court." The court observed that the potentially applicable assertions in the defendant's motion

for directed verdict at the close of the plaintiff's case in chief, which was granted by the trial court, were:

> 1. The evidence is insufficient, as a matter of law, to either support or form a basis for a verdict in favor of plaintiff and against defendant.

> \* \* \*

> 4. No evidence has been offered or received that raises a jury question concerning the allegations contained in plaintiff's pleading.

> \* \* \*

> 8. Plaintiff has failed to establish that she has substantially performed all of her obligations under the contractual agreements between plaintiff and defendant and, in particular, plaintiff's evidence establishes that plaintiff in fact breached the agreement between the parties with respect to the filing of the quit claim deeds which were executed by defendant Pracna as part of the agreement between the parties whereby plaintiff posted bail bonds on behalf of defendant Heartfelt.

> \* \* \*

> 10. Plaintiff has failed to establish any contractual obligation of defendant Pracna to plaintiff in that there was a material alteration to the bond application form signed by defendant Pracna after her signature was applied to said document in that the dollar amount of the bond referred to therein was increased from $25,000 to $325,000 and plaintiff has failed to establish that defendant consented to the alteration of said document.

*Id.* at 502. Noting that the defendant's motion made no request for relief directed to any particular evidence plaintiff pre-

sented (or failed to present) on the issue of damages for breach of contract, the Southern District stated that the allegations contained in the motion for directed verdict were similar to those discussed in *Kincaid* and were, "at best, bare generalities that, as in *McRaven*, boil down to contentions that plaintiff failed to make a submissible case." *Id.* The court then stated:

> They do not identify evidence related to damages as an issue on which defendant Pracna is entitled to a directed verdict. Nothing in the motion approaches a statement of "specific grounds" related to damages. The motion was not an effective pleading. It presented no basis for relief in the trial court.

*Id.*

The Eastern District has also applied these principles. In *Fust v. Francois*, 913 S.W.2d 38 (Mo.App. E.D.1995), for example, one of the defendants asserted that the trial court erred in denying his motion for a directed verdict because the plaintiff had failed to prove one of the prima facie elements of her cause of action for malicious prosecution. *Id.* at 45. Noting that "[i]t is well-established that when a motion for directed verdict does not include the specific reasons or grounds for the motion, it is insufficient to preserve the issue for appellate review," the Eastern District refused to review the issue as preserved error since it had not been raised in the defendant's motion for directed verdict. *Id. See also Dierker Assocs. v. Gillis*, 859 S.W.2d 737, 742–43 (Mo.App. E.D.1993) (holding that because the party who had moved for a directed verdict at the close of all the evidence "did not give specific reasons or grounds for the motion," the motion "failed to comply with the requirements of Rule 72.01(a) and was therefore insufficient to preserve anything for appellate review"); *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 18 (Mo.App. E.D.2004) (internal citation omitted) ("Rule 72.01(a) requires that a motion for a directed verdict state the specific grounds for the motion. A motion for directed verdict that does not include specific reasons or grounds for the motion neither presents a basis for relief in the trial court nor is sufficient to preserve the issue for appellate review.")

In his supplemental letter briefs, Dr. Ray does not even so much as acknowledge this well-developed body of case law. Instead, he asserts that Missouri appellate courts have actually "followed [a] liberal approach in applying the requirements of Rule 72.01 and [have found] that a claim of error is preserved even though [the] motion for a directed verdict presented only vague assertions." In support of his position, Dr. Ray relies on *Gillenwaters Building Co. v. Lipscomb*, 482 S.W.2d 409 (Mo. 1972), as well as a series of Eastern District cases that relied on *Gillenwaters* (and each other), including: *Frisella v. Reserve Life Insurance Co.*, 583 S.W.2d 728, 731–2 (Mo.App. E.D.1979); *Muchisky v. Kornegay*, 741 S.W.2d 43, 45 n. 2 (Mo.App. E.D. 1987); and *Baldridge v. Lacks*, 883 S.W.2d 947, 953 (Mo.App. E.D.1994).

In *Gillenwaters*, which was an appeal from a jury-tried quiet title case, the defendants argued, *inter alia*, "that plaintiff failed to preserve in its after-trial motion either of the points it raises on this appeal." 482 S.W.2d at 411. In that motion, the plaintiff alleged:

> that defendants failed to plead or prove a claim upon which relief could be granted or a defense to plaintiff's claim; that the Court erred in denying plaintiff's motion for directed verdict; that the defense had, over objection, converted the proof from the legal issues raised by the pleadings into "alleged" equitable issues, and that the verdict of the jury on such equitable issues was not binding on the court. The motion contained

many other allegations, with some concerning defendants' main instructions; these included one that those instructions submitted issues not pleaded *"nor proven."*

*Id.* The Court proceeded to say:

In essence, the sole issue here is whether the evidence of defendants was sufficient to create a submissible defense to plaintiff's action based on its record title and whether it was sufficient to justify submission of defendants' counterclaim to quiet title. We hold that the allegations of plaintiff's after-trial motion were sufficient to call the trial court's attention to these decisive questions. We have been rather liberal in considering assignments raising the sufficiency of the evidence, and particularly where such was a pervading issue at the trial. The point on the instructions stands or falls on the sufficiency of defendants' evidence. The contention of a deficiency in plaintiff's motion is denied.

*Id.*

Several things are obvious from the Court's holding in *Gillenwaters*. First of all, the Court did not discuss or even mention Rule 72.01. Second, the Court cited no authority of any kind to support its observation that "[w]e have been rather liberal in considering assignments raising the sufficiency of the evidence, and particularly where such was a pervading issue at the trial." *Id.* Third, and most importantly, in 1972, when *Gillenwaters* was decided, Rule 72 *was worded differently than it is today.* At that time, Rule 72.01 was not divided into subsections as it is now and stated, in its entirety:

The demurrer to the evidence and the request for peremptory instructions are abolished and in lieu thereof a party may make a motion for a directed verdict. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. Upon motion for a directed verdict by a party opposing a claim the court, whether so requested or not, may dismiss the claim with prejudice if justice so requires.

*Missouri Rules of Court* 456 (1972).

Thus, at the time *Gillenwaters* was decided, Rule 72.01 did not provide, as it does now (and has since January 1, 1975), that: "A motion for a directed verdict shall state the specific grounds therefor." This explains why the Court did not discuss the contents of the plaintiff's motion for directed verdict at all, but instead focused exclusively on the contents of the plaintiff's "after-trial motion for judgment." *Gillenwaters,* 482 S.W.2d at 411.[11] Therefore, *Gillenwaters* is no longer good law on the requirements of Rule 72.01, and has not been good law on that subject since the amended Rule 72.01 took effect on January 1, 1975. Likewise, *Gillenwaters'* progeny, three cases all decided by the Eastern

11. Indeed, the reason the Court in *Gillenwaters* referred to the plaintiff's motion as an "after-trial motion for judgment" rather than as a motion for judgment notwithstanding the verdict is that it was not until Rule 72 was amended effective January 1, 1975, that motions for judgment notwithstanding the verdict became an integral part of Rule 72 jurisprudence. *Compare Missouri Rules of Court* 456 (1972) (in which Rule 72 was titled "Motion for Directed Verdict and After Trial Motions") *with Missouri Rules of Court* 505–07 (1975) (in which Rule 72 was retitled "Motion for a Directed Verdict and for Judgment Notwithstanding the Verdict").

District of this court, is also bad law when it comes to Rule 72.01(a),[12] because in each of those cases, the court relied on *Gillenwaters* without properly taking into account the subsequent changes in Rule 72.01, which effectively eliminated whatever liberality might previously have been applied to after-trial motions for judgment. *See Frisella,* 583 S.W.2d at 731–32; *Muchisky,* 741 S.W.2d at 45 n. 2; *Baldridge,* 883 S.W.2d at 953. Moreover, in deciding those cases, the Eastern District did not mention its previous decision in *Quality Dairy Co. v. Openlander,* 456 S.W.2d 608 (Mo.App. E.D.1970), where the defendant's motion for directed verdict "stated only generally that 'plaintiffs have failed to make a submissible case.'" *Id.* at 609. The court held that the motion gave "neither the trial court, opposing counsel, nor this court the specific grounds necessary to preserve this point for review." *Id.*[13]

Dr. Ray also argues that even if his motion for directed verdict was vague and non-specific, it was still effective to preserve the sufficiency issue for appellate review since partnership was "the only contested issue of liability before the trial court" at the time the motion was filed and overruled. However, the record shows that Ms. Pope's case against Dr. Ray as pled in Count III of the petition went to trial on two distinct theories of liability: (1) that Dr. Ray was liable for his *own* negligent failure to warn of suspected child abuse; and (2) that Dr. Ray was liable for his partner Dr. Strnad's negligent failure to warn of suspected child abuse. In fact, during the final instruction conference held just before the case was sent to the jury, Ms. Pope attempted to submit two verdict directors: one hypothesizing Dr. Ray's direct liability for his failure to warn (which was refused),[14] and one hypothesizing Dr. Ray's indirect or vicarious liability for his partner Dr. Strnad's failure to warn (which was given). While Ms. Pope's first theory of liability was ultimately not presented to the jury for its determination, the transcript reveals that it was not until *after* Dr. Ray's motion for a directed verdict at the close of all the evidence had already been made (and denied) that the court decided not to submit that theory to the jury. Therefore, Dr. Ray's argument is refuted by the record.

Dr. Ray further argues that even if his motion for directed verdict at the close of all the evidence was deficient, "the specific statements in [his] Motion for Judgment Notwithstanding The Verdict cured any

12. Notably, Dr. Ray does not cite a single case from the Western or Southern Districts explicitly endorsing *Gillenwaters'* "liberal approach," and ignores many contrary cases from not only those two districts, but from the Eastern District as well (many of which are discussed *supra*), all of which have held vague sufficiency claims to be inadequate to preserve the issue for appellate review.

13. For another pre-amendment Rule 72.01 case reaching the same conclusion, which was cited in passing but essentially ignored in *Frisella,* see *Wilkerson v. State Farm Mutual Automobile Insurance Co.,* 510 S.W.2d 50 (Mo.App. S.D.1974). In *Wilkerson,* the defendant asserted on appeal that the plaintiff had failed to make a submissible case in that there was no substantial showing that a vehicle involved in the accident was uninsured. *Id.* at 55. The Southern District found that the point was not properly preserved for appellate review because the defendant's motion for directed verdict did not state sufficiently specific grounds for relief. *Id.* at 56. Citing the Eastern District's decision in *Quality Dairy,* the court stated that "the bare assignment made here, that plaintiff 'has not made a submissible case under any propounded theory as to this Defendant' is insufficient to preserve anything for review." *Id.*

14. Ms. Pope has not cross-appealed that ruling, which was based on the trial court's interpretation of the scope of our decision in *Bradley v. Ray,* 904 S.W.2d 302 (Mo.App. W.D.1995).

[such] defect in his Motion For Directed Verdict." As noted *supra*, in addition to his motion for a directed verdict at the close of all the evidence, Dr. Ray also filed a Second Supplemental Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial,[15] pursuant to Rule 72.01(b).

■ In paragraph 8 of the JNOV portion of the combined Motion, Dr. Ray averred: "The evidence wholly failed to establish the unpleaded theory of partnership between Dr. Ray and Dr. Strnad[16] or any other basis for imposing liability on Defendant Ray based on the alleged acts or omissions of Dr. Strnad." While this is certainly a more specific statement of grounds for relief than the ones contained in Dr. Ray's motion for directed verdict at the close of all the evidence, the law of this state is clear: "[I]n the absence of a motion for directed verdict which complies with the mandates of Rule 72.01(a), . . . [a] post-verdict motion for judgment n.o.v. is without basis and preserves nothing for appellate review." *McRaven*, 660 S.W.2d at 461; *see also Goede*, 143 S.W.3d at 18; *Letz*, 975 S.W.2d at 163; *Fust*, 913 S.W.2d at 45; *Christ v. Tice*, 578 S.W.2d 319, 322 (Mo.App. W.D.1979).

■ The reason for this rule of law is equally clear. As this court explained in *Daniels v. Board of Curators of Lincoln University*, 51 S.W.3d 1 (Mo.App. W.D. 2001):

Rule 72.01(a) requires that a motion for directed verdict state the specific grounds therefore. A motion for judgment notwithstanding the verdict is a motion "to have judgment entered in accordance with the motion for a directed verdict." Rule 72.01(b). Therefore, a sufficient motion for directed verdict is required to preserve the motion for judgment notwithstanding the verdict and for appeal.

*Id.* at 5–6. Accordingly, a defendant's failure to file a motion for directed verdict which states the specific grounds therefor not only precludes the defendant "from obtaining a judgment notwithstanding the verdict in its favor," but also "further precludes it from obtaining appellate review of the trial court's failure to enter judgment notwithstanding the verdict[.]" *Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 137–38 (Mo.App. E.D.1999).

Dr. Ray nevertheless claims that even if his motion for directed verdict was deficient, "the specific statements in [his] Motion for Judgment Notwithstanding The Verdict cured any [such] defect in his Motion For Directed Verdict." For this proposition, he cites *Stipp v. Meadows*, 996 S.W.2d 764, 766 (Mo.App. S.D.1999), in which the Southern District held that "an unspecific motion for directed verdict can be reviewed if a party is specific in an after-trial motion." To support that hold-

---

**15.** Dr. Ray actually filed a total of three such motions. He filed his original Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial on October 10, 2003, and subsequently filed his first supplemental motion on December 19, 2003. The second supplemental motion was filed on March 16, 2004. The supplemental motions were necessitated by procedural matters that developed or occurred between the filings.

**16.** In his supplemental brief, Dr. Ray concedes that the existence of such a partnership was, in fact, pled in Count III of Pope's petition, upon which final judgment was rendered and to which he filed only a general denial. *See Rule 55.14.* Accordingly, Dr. Ray's allegation that Ms. Pope's "theory of partnership between Dr. Ray and Dr. Strnad" was "unpleaded" was clearly refuted by the record. We need not decide whether this constituted a sufficient independent reason for the trial court to have properly denied Dr. Ray's motion for JNOV.

ing, the Southern District expressly adopted the rationale of *Moore v. Rutger Street Sand Co.,* 416 S.W.2d 1 (Mo.App. E.D.1967). *Stipp,* 996 S.W.2d at 766. In *Moore,* the defendant's motion for directed verdict averred that "under the law and the evidence, plaintiff is not entitled to recover against this defendant." 416 S.W.2d at 3. On appeal, the plaintiff argued that this unspecific statement "saves nothing for appeal." *Id.* Rejecting this contention, the Eastern District held:

> The answer to this contention is that all that is required is for defendant to be specific in presenting his arguments at one point or another during the trial so the trial court has an opportunity to be informed of his contentions and to correct any error it may have committed. Defendant was not specific as to his grounds in his motion for directed verdict. However, he was specific in setting forth his contentions in his after-trial motion for judgment. Accordingly, we rule this point against the plaintiff and will proceed now to the merits of this appeal.

*Id.; Stipp,* 996 S.W.2d at 766 (quoting *Moore,* 416 S.W.2d at 3).

We decline to follow *Stipp* or *Moore.* First of all (and most importantly), the court in *Stipp* relied solely on *Moore,* which was decided more than seven years *before* Rule 72.01 was amended to explicitly require that "[a] motion for a directed verdict shall state the specific grounds therefor." Second, the court in *Moore* cited no authority whatsoever to support its conclusion that "all that is required is for defendant to be specific in presenting his arguments at one point or another during the trial," 416 S.W.2d at 3, a conclusion which makes little sense because it is the directed verdict motion itself, not other arguments which may have been made at different points during the trial, which is

the basis for relief. Third, the Southern District's holding in *Stipp* neither acknowledges nor distinguishes the many earlier cases, from all three districts of the Court of Appeals (including *McRaven,* which was decided by the Southern District prior to *Stipp* ), which hold directly to the contrary. Fourth and finally, in the *Dierker* case, which was decided in 1993, the Eastern District overruled *Moore sub silentio,* when it squarely rejected exactly the same argument it had found persuasive in *Moore.* In *Dierker,* the moving parties filed a motion for directed verdict at the close of all the evidence which did not comply with the requirements of Rule 72.01(a). 859 S.W.2d at 742–43. They then "subsequently raised specific grounds in their written motion for judgment NOV." *Id.* at 743. The Eastern District held that this did not cure the deficiency of the motion for directed verdict, because

> a motion for judgment NOV is properly preserved only when a sufficient motion for directed verdict has been made at the close of all the evidence. Where an insufficient oral or written motion for directed verdict has been made, the post-verdict motion for judgment NOV is without basis and preserves nothing for review.

*Id.* (internal citation omitted). For these reasons, we find *Stipp* and *Moore* unpersuasive and decline to follow them here.

Finally, Dr. Ray asserts that regardless of any deficiencies in his motions for a directed verdict at the close of all the evidence and for JNOV, the trial court had to have been fully aware of their underlying bases because the existence of the partnership was a "crucial" and "pervading" issue at trial. We disagree, as the record does not support Dr. Ray's claim that the existence of a partnership was "hotly contested" by Dr. Ray at trial. To the contrary, the transcript reflects that

the following was the entirety of Dr. Ray's closing argument to the jury concerning that particular issue:

> They are charging him [Dr. Ray] with negligence because of the activity of his partner. They take the position that he's a partner. I don't think he was. I think it is no different from what Dr. Duncan said today when she was sharing offices. If you consider or conclude that it was a partnership, so be it.

To summarize, Dr. Ray's motion for a directed verdict at the close of all the evidence stated merely bare generalities that did not comport with the "specific grounds" requirement of Rule 72.01(a). Consequently, it failed to preserve for appellate review the complaint Dr. Ray attempts to raise in his Point I on appeal. Likewise, Dr. Ray's motion for JNOV was also entirely ineffective to preserve that issue for appellate review.

### Plain Error Review

 Ordinarily, this would conclude our analysis. However, in his supplemental brief, Dr. Ray requests plain error review under Rule 84.13(c) if we conclude that the portion of Point I pertaining to the partnership issue was not preserved for review. Rule 84.13(c) provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the [appellate] court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Rarely applied, the plain error rule is reserved for situations, not raised on appeal or properly preserved, when the court finds that manifest injustice or a miscarriage of justice has resulted therefrom. [It] is not a doctrine available to revive issues already abandoned by selection of trial strategy or oversight." *King v. Unidynamics Corp.,*

943 S.W.2d 262, 266 (Mo.App. E.D.1997) (internal citations omitted).

 Under Rule 84.13(c), plain error review involves a two-step process. *Cohen v. Express Fin. Servs., Inc.,* 145 S.W.3d 857, 864 (Mo.App. W.D.2004); *Wilson v. Simmons,* 103 S.W.3d 211, 220 (Mo.App. W.D.2003). First, we determine whether the claimed error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice has resulted. *Bedwell v. Bedwell,* 51 S.W.3d 39, 43 (Mo.App. W.D.2001); *Gill Constr., Inc. v. 18th & Vine Auth.,* 157 S.W.3d 699, 723 (Mo.App. W.D.2004). In other words, we must first determine whether, on the face of the claim, plain error has, in fact, occurred. Errors are plain if they are "evident, obvious, and clear." *Bedwell,* 51 S.W.3d at 43. In the absence of such error, we should decline to exercise our discretion to review the claimed error under Rule 84.13(c). *Gill,* 157 S.W.3d at 723. If we find plain error on the face of the claim, we may proceed, at our discretion, to the second step to consider whether a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Cohen,* 145 S.W.3d at 864; *see also Wilson,* 103 S.W.3d at 220 (noting that "in the second step of reviewing for plain error, the court must determine whether the evident, obvious, and clear error found resulted in manifest injustice or a miscarriage of justice.")

Applying these principles to the case at bar, it suffices to say that the cumulative evidence on the partnership issue as reflected in the extensive recitation of facts, *supra,* and in particular Exhibits 3 and 4 (reflecting that billings from Dr. Strnad and Dr. Ray were sent out under the name of Columbia Psychological Associates and directed that payment be made to Columbia Psychological Associates), and Exhibit 17 (the renewal endorsement page of the

"Psychologists Professional Liability Policy" issued to Dr. Strnad and Dr. Ray, which recites that their business organization is a "partnership"), as well as related testimony regarding those exhibits, demonstrates that there was no error (plain or otherwise) as asserted in Dr. Ray's Point I. Accordingly, we decline to exercise our discretion to review the claimed error under Rule 84.13(c).

### Oral "Instruction" During *Voir Dire*

 We now proceed to the remainder of Point I, in which Dr. Ray argues that the trial court erred in submitting Instruction No. 7 "because it directly conflicted with oral instructions that the trial court had [previously] given in the case." As the existence of this alleged instructional error was properly preserved for our review in accordance with Rule 70.03, we will consider it on its merits.

The record shows that very early on in the course of the trial, during the *voir dire* process, the trial court made the following remarks to the members of the venire:

THE COURT: The claim against Dr. Strnad is one in which the parties have elected to submit that to arbitration. And you will not be called upon to make a decision with respect to him, either with respect to liability or to damages. However, there will be evidence about him throughout the case. And it may affect the relationship with some of the other parties. And for that reason I need to ask if any of you were acquainted with Dr. Strnad or were a patient of his or were—had a family member perhaps that was a patient of his. Is there anyone here?

Dr. Ray argues that this "oral instruction" to the jury was in "direct contravention" to verdict-directing Instruction No. 7. He further claims that this "resulted in a fundamentally unfair trial for Dr. Ray,

who detrimentally relied on the oral instruction to the jury that they would not be deciding issues related to Dr. Strnad and, therefore, did not present any evidence refuting the allegations brought against Dr. Strnad."

These claims are devoid of merit. In what was clearly an effort to identify any potential juror who might have been disqualified from serving due to his or her prior association with Dr. Strnad, the trial court did not "instruct" the jury as to anything of decisive legal significance, but merely informed the members of the venire that there was going to be evidence about Dr. Strnad throughout the case even though the plaintiff's direct tort claim against Dr. Strnad was going to be arbitrated in a separate proceeding. Moreover, the trial court's preliminary remarks were neither misleading nor conflicting, as Instruction No. 7 clearly and expressly directed the jury to determine only **Dr. Ray's** vicarious liability for damages to Ms. Pope. Furthermore, during closing argument, defense counsel made it crystal clear to the jury that it was not being asked to decide whether Dr. Ray was liable to Ms. Pope on anything but the vicarious liability theory submitted in Instruction No. 7. And finally, while Dr. Ray claims that he did not present any evidence negating Ms. Pope's proof of Dr. Strnad's negligence because he detrimentally relied upon the trial court's remarks during *voir dire*, the record shows not only that Dr. Ray *did*, in fact, present such evidence during trial, but also that this particular allegation was never presented to the trial court (during trial or in Dr. Ray's motion for new trial), was not supported by an appropriate offer of proof during trial, and is being made for the first time on appeal. Therefore, we will not consider this claim of error, *see Rule 84.13(a); Wilson v. Kaufmann*, 847

S.W.2d 840, 846–47 (Mo.App. E.D.1992), and, under the circumstances, also decline to exercise our discretion to consider the issue as plain error under Rule 84.13(c).

For all of these reasons, Point I is denied.

We will now address Point III, since it disposes of the remainder of Dr. Ray's appeal. In Point III, Dr. Ray argues, in relevant part, that the trial court erred in overruling his motion for new trial because the jury's $5 million award of compensatory damages was excessive in that it exceeded a fair and reasonable amount of compensation for Ms. Pope's injuries inasmuch as he was unfairly prejudiced by the trial court's decision to permit Exhibit 17 to be published to the jury during its deliberations.

### Standard of Review

 A complaint, in a motion for new trial, "that the trial court should have set aside the [jury's] verdict as excessive is directed to the discretion of the trial court. The rejection of such complaint by the trial court affords grounds for appellate relief only if the appellate court can find an abuse of discretion on the part of the trial court which may not be based merely upon the size of the verdict but must be founded upon trial error." *Dunn v. St. Louis–San Francisco Ry. Co.*, 621 S.W.2d 245, 255–56 (Mo. banc 1981), *disapproved on other grounds by St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303, 306 (1985). " 'The trial court abuses discretion if its order is clearly against the logic of the circumstances, is arbitrary and unreasonable, and indicates a lack of careful consideration.' " *State ex rel. Ford Motor Co. v. Nixon*, 160 S.W.3d 379, 380 (Mo. banc 2005) (quoting *State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 607 (Mo. banc 2002)).

To properly consider this point, we must first set forth some additional procedural history. As noted *supra*, just prior to the close of all the evidence, Exhibit 17 was offered and admitted into evidence without objection by Dr. Ray.[17] During his closing

---

17. The transcript shows the following:

MR. MILLER: ·I would move for the admission of 1 through 12 and 14 through 19.
THE COURT: Is there any objection by defendant Pope?
MR. PALMER: No, Your Honor.
THE COURT: Is there any objection by defendant Ray?
MR. MUELLER: I don't know what all the exhibits were from 13 on.
THE COURT: All right.
MR. MUELLER: I don't want to take up the time with it.
THE COURT: Well, why don't we take a quick look here. 14 was the videocassette.
MR. MUELLER: No. I have no objection. This is the only one that I had some question about. Exhibit 19, Your Honor. I would, since all of that has—only portions of it have been referred to, Exhibit 19, I would have no objection to those portions. But there may be other portions in there which have not been identified or referred to in any way, and I would not—I would

have an objection—I may have an objection. I haven't gone through all of it.
THE COURT: Well, I can tell you that previously it was offered and admitted without objection. I have initialed this one.
MR. MUELLER: Then I withdraw my objection.
THE COURT: All right.
MR. MUELLER: I withdraw my objection.
THE COURT: That particular—I mean, I try to do that so I'll have a distinct memory.
MR. MUELLER: Okay.
THE COURT: All right. Anything further then for the plaintiff?
MR. MILLER: Nothing—that's the end of your objections? Sir?
MR. MUELLER: Yes.
MR. MILLER: Okay. Judge, I have nothing further. The plaintiff rests after rebuttal.
THE COURT: Defendant Pope have any surrebuttal?
MR. PALMER: No, Your Honor.
THE COURT: Defendant Ray have any surrebuttal?

argument, plaintiff's counsel referred to Exhibit 17 as "their [Drs. Ray and Strnad's] representation that they make to—on their psychologist's professional liability policy." Defense counsel immediately requested permission to approach the bench, after which the following exchange occurred:

> MR. MUELLER: Your Honor, at this time I'm going to ask the Court to declare a mistrial. This exhibit was marked and handed to a witness, Dr. Ray, and it was meticulously—there was absolutely no comment whatsoever that it had anything to do with insurance. It was simply stated that it was put in as a partnership. Counsel has deliberately injected the issue of insurance into this case. It's highly prejudicial. It's grossly improper. It cannot be cured by simply instructing the jury to disregard the last comment. I'm going to move for a mistrial.
>
> MR. MILLER: I offered it into evidence without objection.
>
> MR. MUELLER: *That does not mean that it would be passed to the jury.* Or that anything else might occur. He was very cautious when he questioned the witness about it. About where it came from or what the origin was. He went to one word on the document and de-

scribed it as being—Is this important to your business? Now he says it's insurance. It's prejudicial. It's extremely prejudicial, and I'm going to move for a mistrial, Judge.

> MR. MILLER: Judge, I offered it into evidence. He didn't object.
>
> THE COURT: The objection's overruled. The motion for mistrial will be denied.
>
> MR. MILLER: Thank you.

(Emphasis added.) Plaintiff's counsel continued his argument, but made no further reference to "insurance," either then or in his rebuttal argument. The case was then submitted to the jury, which, after deliberating for just under an hour, sent a note to the trial court requesting, *inter alia,* that it be provided with all the exhibits, including Exhibit 17. Defense counsel objected, arguing that Exhibit 17 should not be published to the jury "for the same reasons that I mentioned when counsel—when I moved for a mistrial." Defense counsel's objection was overruled, and a slightly modified version of Exhibit 17, from which only the entries corresponding to the aggregate and per-occurrence limits of liability ($1 million), deductible ($0), and annual premium ($900) had been redacted, was published to the jury. After deliberating

---

MR. MUELLER: No, Your Honor.

THE COURT: Strnad?

MS. CRAIG: No, Your Honor.

THE COURT: Ladies and gentlemen, the evidence in the case is closed.

Dr. Ray urges us to take note that this "clearly indicates that the trial court never admitted Exhibit 17 into evidence." However, after carefully reviewing Ms. Pope's subsequent post-trial motion to amend the transcript pursuant to section 512.110 and associated suggestions in support of and opposition to that motion (which was sustained by the trial court on March 16, 2004), we are satisfied that Exhibit 17 was indeed admitted into evidence without objection by Dr. Ray, constructively if not formally, particularly since de-

fense counsel stated that he didn't "want to take up the time" to address the issue and expressly withdrew his sole objection, which dealt with Exhibit 19, not Exhibit 17. *See In re Estate of Graham,* 59 S.W.3d 15, 20–21 (Mo.App. W.D.2001) (holding that even though the trial court never expressly declared that the challenged exhibits had been admitted into evidence, where any objections to their admission had been properly overruled "and the counsel who offered the evidence received from the court an understanding that the matters were in evidence, the documents will be deemed admitted.") In any event, since Dr. Ray has not appealed the trial court's ruling on that motion, the issue is academic.

for an additional hour and a half or so, the jury returned its verdict in favor of Ms. Pope in the amount of $5 million.

### Insurance

 "In personal injury actions, it is generally reversible error to directly or indirectly show that [the] defendant carries liability insurance." *Hamilton v. Slover,* 440 S.W.2d 947, 956 (Mo.1969), *overruled on other grounds by Stover v. Patrick,* 459 S.W.2d 393, 401 (Mo. banc 1970). *See also Page v. Unterreiner,* 106 S.W.2d 528, 537 (Mo.App. S.D.1937) (noting that in personal injury cases, the general rule is that it is "reversible error ... to directly or indirectly show that the defendant carries liability insurance").

Even so, "not every reference to insurance constitutes reversible error or requires the discharge of a jury." *Taylor v. Republic Auto. Parts,* 950 S.W.2d 318, 321 (Mo.App. W.D.1997). In part, this is because "[t]here are instances when it is proper to prove that a defendant has liability insurance[.]" *Whitman v. Carver,* 337 Mo. 1247, 88 S.W.2d 885, 888 (1935). Although these instances are relatively rare, *see Carter v. Wright,* 949 S.W.2d 157, 162 (Mo.App. W.D.1997); *Stafford v. Far–Go Van Lines, Inc.,* 485 S.W.2d 481, 493 (Mo. App. W.D.1972), such evidence is properly admitted when it "is relevant and material to some issue involved" in the case. *Whitman,* 88 S.W.2d at 888. *See also Steinman v. Brownfield,* 18 S.W.2d 528, 530 (Mo.App. E.D.1929) (collecting older Missouri authority and concluding that "[g]enerally speaking, the cases hold that it is competent to show that there is liability

insurance where such fact goes to prove any material issue properly in the case"); *Page,* 106 S.W.2d at 537 ("Such evidence, however, may be admitted where it is material, as tending to establish an incidental fact in issue[.]"); *McCaffery v. St. Louis Pub. Serv. Co.,* 363 Mo. 545, 252 S.W.2d 361, 367 (1952) (holding that such evidence is admissible if "the issues in the case make the fact of insurance relevant."); *Hayes v. Jenkins,* 337 S.W.2d 259, 262 (Mo.App. S.D.1960) (party may inject existence of insurance into the case so long as it "provides a substantial basis for its use as legitimate evidence").[18]

 Of course, Missouri appellate courts have long been mindful of the rule that "[e]vidence is admissible if it tends to prove one issue, even though it is not admissible to prove another issue, and is prejudicial upon such latter issue." *Boten v. Sheffield Ice Co.,* 180 Mo.App. 96, 166 S.W. 883, 888 (W.D.1914); *see also Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 775 (Mo. banc 1989) ("Evidence admissible for one purpose may be admitted even though it may be improper for other purposes.") Accordingly, this court has held:

> Notwithstanding the general rule against the introduction of evidence declaring or suggesting that the defendant is protected by liability insurance, such disclosure or suggestion will not be avoided at the cost of suppressing evidence material to the establishment of a cause of action and the liability of the defendant. Under such circumstances the rule is applied that where evidence

---

**18.** There are, of course, other contexts in which a reference to insurance may be proper, including, for example, when it is made "for the purpose of showing the interest or bias of a witness, or where it is necessary for plaintiff's counsel, in passing on the qualifications of the jurors, to know if any of them are stockholders or employees of an insurance company interested in the defense of the case." *Page,* 106 S.W.2d at 537; *see also Wilson,* 847 S.W.2d at 851 ("Litigants have a right to determine whether a venire person is connected with an insurance company interested in the litigation.")

has probative value on a material, controverted issue and is otherwise admissible thereon but would·be improper for other purposes or other issues in the case, it should be received.

*Nuckols· v. Andrews Inv. Co.,* 364 S.W.2d 128,·138·(Mo.App. W.D.1962) (internal citations omitted).

Under this standard, Exhibit ·17 was clearly admissible since it was relevant and material to establish Ms. Pope's cause of action against Dr. Ray·(in particular, to establish the factual and legal basis for Dr. Ray's vicarious liability to Ms. Pope arising from the negligence of his alleged·partner, Dr. Strnad), and Dr. Ray essentially concedes as much in his brief. Indeed, inasmuch as this critical condition was met here, the admission of such evidence was "not only proper but necessary to the due administration of ·justice." *Hannah v. Butts,* 330 Mo. 876,·51 S.W.2d 4, 7 (1932). *See also Joyce v. Biring,* 226 Mo.App. 162, 43 S.W.2d 845, 848 (E.D.1931) (holding that once the question of insurance had properly been injected into the case and proof thereof had been·properly admitted into evidence, "plaintiff's counsel had a right to comment upon it").

The Court has nevertheless admonished the bench and bar to "keep in mind that the introduction of such highly prejudicial evidence is a serious and hazardous matter [which] is to be avoided rather than sought for." *Olian v. Olian,* 332 Mo. 689, 59 S.W.2d 673, 677 (1933). In fact, our Supreme Court has colorfully reminded litigants and judges alike that even in cases where, as here, "the presence of insurance [is] no secret," a plaintiff does not have free "license to flaunt insurance coverage in the jury's face." *Ballinger v. Gascosage Elec. Coop.,* 788 S.W.2d 506, 513 (Mo. banc 1990), *overruled on other grounds by Zueck v. Oppenheimer Gateway Properties, Inc.,* 809 S.W.2d 384, 384

(Mo. banc 1991); *see also Amador v. Lea's Auto Sales & Leasing,* 916 S.W.2d 845, 851 (Mo.App. S.D.1996) ("The plaintiff does not have the right to flaunt insurance coverage in the jury's face."); *Hildreth v. Key,·* 341 S.W.2d 601, 615 (Mo.App. S.D. 1960) (noting that the reported cases "contain many ringing condemnations of, and many pointed warnings about, the oft-indulged practice of parading liability insurance coverage before juries"). Therefore, with regard to the introduction of insurance coverage evidence which is probative as to a material issue in the case, the Court ·has required that the interests of both plaintiffs and defendants be protected through the use of an appropriate limiting instruction: "[W]here [such] evidence is competent and material on one issue in the case, it is not error to admit it, *however er prejudicial it may be, and then by proper· instructions limit the evidence·to its legitimate · purpose."* *Olian,* 59 S.W.2d at 677 (emphasis added).

The transcript shows that this did not happen here. To the contrary, it shows that the trial court overruled defense counsel's objection and permitted Exhibit 17 to be published to the jury while it was in the midst of its deliberations *without* the benefit of an appropriate limiting instruction, even though the court was clearly aware that Exhibit 17 was only admissible for the limited purpose of proving that Drs. Ray ·and Strnad were partners:

THE COURT: All the exhibits were offered without limitation and received without limitation, and I'm going to overrule your objection. There are some times when they are—have a limited purpose and there are matters that are redacted and so forth. But I am not—I'm going to overrule your objection to 17.

The court's statement· clearly demonstrates that the court understood that Ex-

hibit 17 had a limited purpose and recognized the need for not only appropriate redactions, but a limiting instruction as well. While this opinion should not be read as requiring trial courts to give limiting instructions *sua sponte* in all cases, under the unique facts of this case, we do hold that the trial court's ruling was against the logic of the circumstances. Those circumstances demanded, at a bare minimum, that before being allowed to conduct a detailed examination of Exhibit 17 within the jury room, Exhibit 17 should not only have been extensively redacted, but the jury should also have been instructed that Exhibit 17 could only be considered on the issue of whether Drs. Ray and Strnad were partners and could not be considered for any other purpose. The trial court's ruling was also arbitrary and unreasonable and indicated a lack of careful consideration since its practical effect was "to flaunt insurance coverage in the jury's face," which is prohibited even when, as here, evidence of such coverage is admissible. *Ballinger*, 788 S.W.2d at 513.

Under these conditions, it is quite likely that the amount of damages awarded to Ms. Pope by the jury was substantially higher than it would have been had a proper limiting instruction been given.[19] *Cf., e.g., Nuckols*, 364 S.W.2d at 138 (no reversible error in admitting evidence referring to insurance coverage where it "was suggested to [defendant's] counsel by the court that if he desired to have the court instruct the jury limiting the evidence to the issues of ownership and joint control the court would do so," but counsel "declared he did not want a limiting instruction"); *Griffon v. Northcott*, 655 S.W.2d 883, 885 (Mo.App. E.D.1983) (no

reversible error in refusing to grant a mistrial after reference to insurance coverage during closing argument where "it [was] clear that the trial court acted swiftly and adequately to avert any prejudice that might have otherwise resulted"); *Gilbert v. K.T.I., Inc.*, 765 S.W.2d 289, 299 (Mo.App. W.D.1988) (no reversible error in refusing to grant a mistrial after reference to insurance coverage during opening statement where there was a "careful effort by the [trial] court to narrow the relevant portions of the exhibits" concerning insurance "to the element of knowledge as set forth in the modified jury instructions" and where the court "restricted any use of the exhibits to prove [only] the issue of knowledge" via a limiting instruction).

Therefore, we hold that, even though Exhibit 17 was properly admitted into evidence and plaintiff's counsel acted well within his rights to mention it during his closing argument, under the circumstances here the trial court abused its discretion in overruling Dr. Ray's separate and timely objection to allowing Exhibit 17 to be published to the jury, which was assigned as error in his motion for new trial. Accordingly, he is entitled to relief on appeal.

As to the extent of that relief, Dr. Ray requests that this court grant him a new trial on both damages *and* liability (or, in the alternative, an order of remittitur as a condition of affirmance), arguing that this is warranted because "the verdict was so grossly excessive as to indicate that the entire outcome of the case was the product of. bias and prejudice engendered against [him] through the admission and publication to the jury of the declarations sheet of

---

19. In his closing argument to the jury, plaintiff's counsel encouraged the jury to return a damage award of between $1 and $4 million. The fact that the jury's award was $5 million (or $1 million more than the highest figure

counsel had requested) is, of course, a concrete indication of Exhibit 17's unfairly prejudicial effect in producing an award of that size.

[his] professional liability insurance policy." We decline to do so inasmuch as: (1) Exhibit 17 was clearly admissible on the issue of partnership; and (2) Dr. Ray points to nothing in the record which suggests that Exhibit 17 had any unduly prejudicial effect on the jury other than its propensity to increase the *size* of the damage award. Moreover, we believe that the drastic relief of a new trial on all issues in a case that has been percolating through Missouri courts, in one form or another, since March 1991 is neither necessary nor appropriate here inasmuch as the $5 million damage award was not "grossly excessive" (*i.e., per se* indicative that the jury's underlying verdict in favor of Ms. Pope was *itself* the product of bias, prejudice, misconduct of plaintiff's counsel, and/or trial court error), but only "merely excessive" (*i.e.,* indicative only that the jury made an honest mistake in awarding a disproportionate amount of money). *See Worley v. Tucker Nevils, Inc.,* 503 S.W.2d 417, 423 (Mo. banc 1973); *Ince v. Money's Bldg. & Dev., Inc.,* 135 S.W.3d 475, 478 (Mo.App. E.D.2004); *Koehler v. Burlington N., Inc.,* 573 S.W.2d 938, 944–45 (Mo.App.1978) (so describing the difference between "grossly excessive" and "merely excessive" verdicts).

While we have the discretion to require a remittitur as a condition of the affirmance of a "merely excessive" verdict, *Worley,* 503 S.W.2d at 423; *Ince,* 135 S.W.3d at 478–79, Rule 84.14 also gives us the authority to "award a new trial or partial new trial" and to "reverse or affirm the judgment or order of the trial court, in whole or in part," with an eye toward "dispos[ing] finally of the case" unless "justice otherwise requires." In the case *sub judice,* and in accordance with Rule 84.14, we hold that while justice requires that Dr. Ray be granted a new trial, that new trial shall be solely on the issue of damages. *See, e.g., Hotchner v. Liebowits,* 341 S.W.2d 319, 332–33 (Mo.App. E.D. 1960) (case remanded for further proceedings on issue of damages only where jury properly determined that defendant was liable and only reversible error concerned damage instruction); *DeMoulin v. Kissir,* 446 S.W.2d 162, 166 (Mo.App. E.D.1969) (where liability was properly established and sole reversible error on appeal pertained to damages, only damages issue needed to be retried on remand); *Moore v. Woolbright,* 645 S.W.2d 376, 377 (Mo.App. S.D.1983) (where error in jury instruction affected only the issue of damages, new trial was properly limited to that issue); *O'Connor v. Quiktrip Corp.,* 671 S.W.2d 17, 19–20 (Mo.App. W.D.1984) (declining to enter judgment by requiring remittitur as a condition of affirmance and remanding for new trial on issue of damages only where the amount of a default judgment in favor of plaintiff was found to be excessive on appeal). Point granted in part.

In view of this disposition of the case, it is unnecessary to discuss or rule upon Dr. Ray's remaining three points relied on, all of which also concern the amount of damages. *See Hotchner,* 341 S.W.2d at 333 (declining to address appellant's second point, which also concerned damages, where first point had been resolved in his favor, resulting in a new trial solely on the issue of damages).

## IV. Conclusion

The judgment is affirmed in all respects except as to the award of damages. The judgment as to damages, including, of necessity, the award of pre-judgment and post-judgment interest, is reversed and the cause is remanded for a new trial on the issue of damages only.

SMITH, C.J., LOWENSTEIN, ULRICH, BRECKENRIDGE,

SPINDEN, SMART, Jr., HOWARD, NEWTON, HOLLIGER, and HARDWICK, JJ., concur.